**BOLAND–MALONEY LUMBER COMPANY, INC., Appellant,**

v.

**Douglas BURNETT; and Anthem Health Plans of Kentucky, Inc., Appellees.**

and

**Douglas Burnett, Appellant,**

v.

**Boland–Maloney Lumber Company, Appellee.**

Nos. 2008–CA–000059–MR, 2008–CA–000299–MR.

Court of Appeals of Kentucky.

Sept. 11, 2009.

Jamie K. Neal, Bethany A. Breetz (argued), John L. Tate, James M. Gary, Patrick W. Gault, Louisville, KY, for appellant/cross-appellee, Boland–Maloney.

Thomas H. Hughes (argued), Kerstin Schuhmann, Louisville, KY, for appellee/cross-appellant, Douglas Burnett.

Before ACREE, STUMBO, and WINE, Judges.

## OPINION

WINE, Judge.

The appellant, Boland–Maloney Lumber Company, Inc. (hereinafter "Boland–Maloney"), appeals to this Court from a jury verdict in a negligence action involving an injury which occurred on a staircase. Boland–Maloney argues that the appellee Douglas Burnett failed to present a *prima facie* case of negligence against it, that the trial court denied Boland–Maloney its fundamental right to apportionment against a dismissed codefendant, and that it is entitled to a new trial. We disagree. Douglas Burnett cross-appeals, arguing that he is entitled to a new trial on the sole issue of future medical expenses. We agree that he should be granted a new trial on the issue of future prescription medication expenses.

## Factual Background

At the time of trial, the appellee Douglas Burnett ("Doug") and his brother, Mike Burnett ("Mike"), were the co-owners of a business called LMD Investments, LLC ("LMD"), which financed construction projects. Doug and Mike also co-owned a construction company, Citadel Construction ("Citadel"), a general contracting business. In the spring of 2002, Doug and Mike decided to erect a 12,000 square-foot commercial office building in the Stonecrest Building Park of Shelbyville, Kentucky. LMD and Citadel acted as both financier and general contractor for the project.

In preparation for construction of the building, Mike (who was primarily responsible for the Stonecrest Building Park project) hired an architectural firm to draw blueprints for the building. After the blueprints were completed, Mike went to Boland–Maloney's place of business to obtain the necessary materials and supplies to frame the building. While at Boland–Maloney's, a salesperson approached Mike and informed him about Boland–Maloney's "turn-key" program. Under its "turn-key" program, Boland–Maloney would supply the building materials and supplies and would *also* perform and supervise the framing of the building, including the framing of the stairways. Mike agreed to purchase the "turn-key" service from Boland–Maloney. Under the agreement, Boland–Maloney would erect the superstructure of the building from foundation to roof and turn over to LMD and Citadel a building which was essentially complete except for masonry, shingles, and other finishing touches.

As Boland–Maloney was primarily in the business of furnishing building supplies, it subcontracted the framing work to Second Framing Corporation. Second Framing agreed to provide the physical labor and conduct all of the actual framing (including the framing of the stairs). Although Second Framing performed all of the actual labor, the framing work was overseen and supervised by Boland's "turn-key" supervisor, Danny Wilkerson ("Wilkerson").

Second Framing completed the framing work on the building and was paid for its work by Citadel in November of 2002. Second Framing then demobilized and vacated the premises. On December 17, 2002, approximately three weeks after Second Framing had vacated the building, Mike and Doug met at the building to discuss wiring options with an electrician. On that day, there was no construction taking place in the building. The three men ascended a stairway to the second

floor of the building where they discussed division of the floor space among prospective tenants. After their discussion, the three men walked down the stairs. Mike and the electrician descended the stairs without problem, but as Doug was descending the stairs, he fell, sustaining serious injuries.

Doug testified at trial that as he began to place his foot where the next step would be after turning past a landing on the stairs, he felt as if he had "stepped into a hole." Doug fell forward into a hand rail which collapsed, allowing him to fall face-first onto a concrete floor approximately ten feet below. He sustained serious injuries, including facial bone fractures, a brain injury resulting in a seizure disorder, trauma to his right eye socket, fractures to various other parts of his body, permanent stacked and double vision, as well as the loss of peripheral vision in his right eye. As a result of his injuries, Doug was hospitalized for two months. At the time of trial, Doug was taking eleven pills per day in attempt to control his seizures.

Thereafter, Doug filed suit against Boland–Maloney, Second Framing, and others, claiming in part that Boland had deviated from the architectural blueprints by allowing the stairway to be framed with seven steps instead of six. Doug claims that this "double-riser" resulted in a stair riser for one step which was twice as high as the other risers on the stairway. The riser did not comply with the building blueprints and violated applicable building standards requiring uniformity in the height of stair risers. However, the trial court excluded all references to the applicable building codes, finding that they only applied to finished buildings rather than buildings under construction.

Second Framing and Boland–Maloney each filed cross-claims against each other asserting indemnity and apportionment.

Subsequently, Second Framing filed a motion for summary judgment as to the claims of the plaintiff. Neither Doug nor Boland–Maloney responded to the motion, and the trial court dismissed Second Framing from the action on August 17, 2006. Boland–Maloney's and Second Framing's cross-claims against one another were dismissed on February 22, 2007, by an agreed order which also purported to reserve to Boland–Maloney the right to seek an apportionment instruction at trial.

After a jury trial, Doug was awarded damages in the amount of $2,268,878.20. The award apportioned 80 percent of the fault to Boland–Maloney, 15 percent of the fault to Citadel, and 5 percent of the fault to Doug. Boland–Maloney was not allowed an apportionment instruction against Second Framing. Boland–Maloney moved for a judgment notwithstanding the verdict ("JNOV"), or in the alternative, for a new trial. Both motions were denied. Boland–Maloney now appeals, arguing that Doug failed to establish Boland–Maloney's duty and breach through lay testimony, that it was entitled to an apportionment instruction, and that it was entitled to a new trial. Doug appeals, arguing that he is entitled to a new trial on the sole issue of future medical expenses, which the trial court disallowed.

## Analysis

### A. *Burnett Presented a Prima Facie Case of Negligence*

To begin, we first discuss Boland–Maloney's claim that the trial court erred by failing to enter a JNOV regarding Doug's alleged failure to present a *prima facie* case of negligence at trial.

■ Boland–Maloney argues that Doug was required to present expert testimony at trial in order to prove Boland–Maloney's duty. Boland–Maloney argues that

neither of Doug's expert witnesses testified as to the standard of care for a contractor or subcontractor when constructing a stairway on a construction site. Rather, Doug's expert witness, Jim Guthrie (Kentucky's Chief Building Inspector), only testified to the appropriate conditions for a finished building. Further, Doug's other expert, architect Gary Kleier, was precluded by the trial court from testifying as to the standard of care for a contractor because he had no personal contracting experience.

In any negligence action under Kentucky law, a plaintiff must prove the existence of a duty, breach thereof, causation, and damages. *Illinois Central Railroad v. Vincent,* 412 S.W.2d 874, 876 (Ky. 1967); *Mullins v. Commonwealth Life Insurance Company,* 839 S.W.2d 245, 247 (Ky.1992). The existence of a duty is a question of law for the court, while breach and injury are questions of fact for the jury. *Pathways, Inc. v. Hammons,* 113 S.W.3d 85, 89 (Ky.2003). Causation presents a mixed question of law and fact. *Id.* Therefore, we review Boland–Maloney's allegation of error that Doug failed to prove Boland–Maloney owed him a duty *de novo,* as it presents a question of law.

Duty may be established in several ways, but ultimately, "[t]he most important factor in determining whether a duty exists is foreseeability." David J. Leibson, 13 *Kentucky Practice: Tort Law* § 10.3, p. 113 (1995). Although *foreseeability* tends to be elusive in definition, perhaps most famously, Judge Cardozo stated on the subject of *duty* that "[t]he risk reasonably to be perceived defines the duty to be obeyed[.]" *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928). Generally, each person "owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury." *Isaacs v.*

*Smith,* 5 S.W.3d 500, 502 (Ky.1999), quoting *Grayson Fraternal Order of Eagles v. Claywell,* 736 S.W.2d 328, 332 (Ky.1987), *reversed on other grounds.* Ordinary care is defined as the degree of care which a reasonably prudent person would exercise under the same or similar circumstances. *T & M Jewelry, Inc. v. Hicks ex rel. Hicks,* 189 S.W.3d 526 (Ky.2006). However, in cases involving professionals or professions requiring special skill and expertise, the standard is typically measured by the standard of conduct customary in the profession under the circumstances. *See, e.g., Daugherty v. Runner,* 581 S.W.2d 12, 16 (Ky.App.1979); *Hyman & Armstrong, P.S.C. v. Gunderson,* 279 S.W.3d 93 (Ky. 2008). In such cases, expert testimony is typically required to establish the standard of care. *Greer's Adm'r v. Harrell's Adm'r,* 306 Ky. 209, 213, 206 S.W.2d 943, 946 (1947).

However, expert testimony is not always required in cases involving professional negligence. Rather, our courts have long recognized an exception in cases where the negligence of the professional is so apparent that even a layperson could recognize it. *Baptist Healthcare Systems, Inc. v. Miller,* 177 S.W.3d 676, 681 (Ky. 2005). Restated, an expert witness is required to establish the standard of care in professional negligence cases in Kentucky, unless the standard is within the general or common knowledge of laypersons. *Id.*

We find that the uniformity of stair risers on a stairway is an abundantly apparent standard, even among laypersons. Here, where there was a "double-riser"—that is, a stair riser in a stairway that was not uniform with the height of all of the other stairs in the stairway—it seems clear that most anyone could interpret the exceptional foreseeability of risk therefrom. As such, we cannot say that the trial court abused its discretion in allowing the mat-

ter to proceed to the jury absent expert testimony on Boland–Maloney's duty.

■ Finally, we only briefly mention Boland–Maloney's argument that Doug failed to prove causation. We find the argument to be without merit as causation in this case turned on a question of fact. That question was for the jury, and there was more than enough evidence for the issue to go to the jury. *Huffman v. S.S. Mary and Elizabeth Hospital,* 475 S.W.2d 631 (Ky.1972). Doug's testimony that prior to the fall he felt as if he had stepped into a hole is understandable in view of the difference between the height of the double-riser and every other riser in the three series of steps. The jury determined that the double-riser was the proximate cause of Doug's fall, and we will not disturb their finding.

### B. Boland–Maloney was not Improperly Denied Apportionment Against Second Framing

We now address Boland–Maloney's second allegation of error, that it was deprived of the "fundamental right to apportion fault against the company that actually built the stairs."

■ In tort actions involving the fault of two or more parties, apportionment of damages is required. Kentucky Revised Statute(s) ("KRS") 411.182. An apportionment instruction is required where there has been an active assertion of a claim against joint tortfeasors even when one of the defendants is not a party at the time of the trial. *Floyd v. Carlisle Construction Co., Inc.,* 758 S.W.2d 430, 432 (Ky.1988). However, such an instruction is only allowable where the evidence is sufficient to submit the issue of liability to

the jury for each. *Id.* If a party has been dismissed because the evidence was insufficient as a matter of law to support a finding of liability, then it would not only be inappropriate, but error, to include that party in the apportionment instructions. *Barnes v. Owens–Corning Fiberglas Corp.,* 201 F.3d 815, 826 (6th Cir.2000).

Boland–Maloney argues that the reason for the entry of summary judgment in favor of Second Framing was because Doug failed to respond to Second Framing's motion for summary judgment. After reviewing the memorandum and order of the trial court, it is clear that the initial trial judge[1] did not enter judgment in favor of Second Framing because Doug and Boland–Maloney failed to respond. Rather, noting that no responses had been filed, the judge simply found the motion was ripe for submission. The court made a determination on the merits in favor of Second Framing, finding that there were no genuine issues of material fact in the record to prevent entry of judgment as a matter of law. While Boland–Maloney is correct that a joint tortfeasor does have a right to the apportionment of fault, that right does not extend so far as to allow the apportionment of fault to a party whose liability has been judicially determined not to exist. *Jenkins v. Best,* 250 S.W.3d 680, 686–87 (Ky.App.2007). Boland is not entitled to apportionment against Second Framing because Second Framing was determined not to be liable as a matter of law. Therefore, the trial court did not err in refusing to allow any apportionment of fault to Second Framing.

### C. Boland–Maloney is Not Entitled to a New Trial

Boland–Maloney also argues that it is entitled to a new trial due to: (1) the

---

1. The trial judge originally assigned to the case retired shortly after ruling on most of the pretrial motions.

denial of its motion for leave to obtain expert witnesses, (2) the denial of its motion to exclude the testimony of John Tierney, and (3) the improper testimony of Jim Guthrie and Jeff Tinnell. We review evidentiary errors under an abuse of discretion standard. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). We will not overturn an evidentiary ruling unless "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581.

### (1.) Motion for Leave to Obtain Expert Witnesses

 At the outset, we note that a trial court has inherent authority to enforce its own orders. *Akers v. Stephenson*, 469 S.W.2d 704, 706 (Ky.1970). Further, the trial courts are given broad discretion to admit or exclude evidence, including that of expert witnesses. *Baptist Healthcare Systems, supra* at 680. *See also Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974). Here, the trial court entered a pretrial order specifying the times for expert disclosures, among other things. Boland–Maloney failed to disclose its experts according to the pretrial order of the trial court prior to the first assigned trial date.[2] Boland–Maloney moved the court for leave to introduce expert witnesses approximately one year after the time for such disclosure expired, reasoning that, as the case had been reassigned, additional time would be allotted for discovery. This motion also came on the heels of an agreement which Boland–Maloney had signed and filed with the trial court, requesting that the trial be continued, and specifically agreeing that *no new expert evidence* would be intro-

duced. Indeed, the trial court entered an order on November 20, 2006, (based upon the agreed order between the parties) stating that no additional discovery would be allowed in the case.

In light of the foregoing, we cannot say that the trial judge's decision was an abuse of discretion. Indeed, if this court were to find abuse of discretion under the facts of this case, it would be tantamount to finding that a trial court cannot enforce its own orders. While the trial court here certainly could have exercised its discretion to grant Boland–Maloney leave to obtain expert witnesses, it chose not to do so. As a trial court has inherent authority to enforce its own orders, the trial court's refusal to grant the motion was not error but was within its sound discretion.

### (2.) Motion to Exclude the Testimony of John Tierney

 Boland–Maloney also argues that it is entitled to a new trial based on the denial of its motion to exclude the testimony of John Tierney ("Tierney"). Tierney testified as an economic expert at trial concerning Doug's earning capacity. Boland–Maloney argues that Tierney's testimony should have been excluded on the ground that Tierney failed to use Doug's *actual* career at the time of injury to calculate his loss of earning capacity but instead used a "proxy." Namely, Tierney calculated Doug's lost earning capacity based upon the classification of "construction supervisor" or "construction manager." Boland–Maloney argues that this classification was improper, especially as Doug himself had previously testified that he was not a construction manager or construction supervisor.

**2.** Boland–Maloney also, notably, failed to disclose its experts within the time mandated by

its agreed order with appellees.

Tierney testified at trial that he had worked in the field of vocational counseling and rehabilitation since 1965. He based his testimony in the case upon his interview of Doug, upon information he was provided concerning Doug's employment and educational history, and upon the nature of Doug's injuries. Tierney testified that when a worker's actual earnings are not indicative of a worker's earning power, he uses a "proxy." Tierney testified that Doug and Mike had only recently begun their new business venture at the time of Doug's injury and that his earnings at that time were not indicative of his earning power because most of the company's income was going toward debt at the time. Tierney looked toward Doug's work history to determine a suitable proxy. He looked at Doug's prior occupation as a licensed engineer at Louisville Gas and Electric (LG&E) and extrapolated that Doug could have made $65,000 a year as an engineer. However, Tierney felt a better proxy for Doug was that of "construction supervisor" or "construction manager," which averaged $48,698 to $66,571 a year (potentially a lower figure than an engineer's salary).

Kentucky caselaw clearly indicates that the sort of testimony offered by Tierney is acceptable. *See, e.g., Stearns Coal & Lumber Co. v. Williams*, 164 Ky. 618, 176 S.W. 15 (Ky.1915); *Pickard Chrysler, Inc. v. Sizemore*, 918 S.W.2d 736 (Ky.App.1995). Indeed,

> While it is true, of course, that evidence of plaintiff's earning capacity in his particular profession or trade is admissible and may be considered by the jury in determining how much his earning capacity has been impaired ... it is not proper to confine the recovery to the particular profession or occupation in which plaintiff may be engaged at the time of the injury.

*Stearns, supra*, at 16. Rather, it has long been the law in Kentucky that damages for loss of earning capacity are not strictly measured by actual loss or earnings but by the impairment of the plaintiff's power to earn money. Although Tierney's testimony was not based on Doug's actual earnings at the time of his injury, nothing precludes testimony by a vocational expert on the impairment of a plaintiff's power to earn money, or the use of a "proxy" to do so where current earnings are not indicative of the plaintiff's earning power. As such, the trial court did not abuse its discretion.

### (3.) Testimony of Jim Guthrie and Jeff Tinnell

Boland–Maloney's final argument for a new trial is based upon the testimony of Jim Guthrie and Jeff Tinnell. Boland–Maloney argues that Guthrie and Tinnell's testimony improperly relied upon the Kentucky Building Code, in violation of the trial court's prior order that the Plaintiff's witnesses could not testify that the stairs violated the Kentucky Building Code.

Boland–Maloney misconstrues the order of the trial court. The order did not forbid *any* reference to the Kentucky Building Code, or any reliance thereon, but only forbade the parties from referring to the fact that the stairs were built in violation of the code. As such, Boland–Maloney is incorrect that Guthrie and Tinnell should not have been able to testify that the stairs posed a "hazard." Moreover, Boland–Maloney did not object to this testimony at trial. Further, Boland–Maloney's own counsel brought up the Kentucky Building Code during cross-examination. Although we do not find the testimony was in violation of the trial court's order, we note that Boland–Maloney has waived its right to complain of this issue on appeal anyway.

Thus, we affirm the trial court on this alleged ground of error.

### D. Jury Instructions

▮▮▮▮▮ Finally, Boland–Maloney argues that the trial court erred by imposing a strict liability standard instead of a negligence standard when it included "unreasonably dangerous" language in one of the jury instructions. We are not convinced that Boland–Maloney properly preserved this error for review. At the completion of the testimony, the parties and the court began discussing jury instructions. Although there was no specific objection by Boland–Maloney as to the language "unreasonably dangerous," counsel for Boland–Maloney did ask if they could "stand on their instructions as submitted." The trial court agreed, and the parties and court continued their discussion. Subsequently, the trial court tendered final instructions. Neither party objected to those final instructions. Kentucky Rules of Civil Procedure ("CR") 51(2) and (3) provide:

(2) After considering any tendered instructions ... the court shall show the parties the written instructions it will give the jury, allowing them an opportunity to make objections out of the hearing of the jury.

(3) No party may assign as error the giving or the failure to give an instruction unless he has fairly and adequately presented his position by an offered instruction or by motion, or unless he makes objection before the court instructs the jury, **stating specifically** the matter to which he objects and the **ground or grounds** of his objection.

(Emphasis added.) "The underlying purpose of CR 51(3) is to 'obtain the best possible trial at the trial court level' by 'giv[ing] the trial judge an opportunity to correct any errors before instructing the

jury.'" *Sand Hill Energy, Inc. v. Smith,* 142 S.W.3d 153, 162 (Ky.2004) (internal citations and footnotes omitted). Thus, we believe the failure to specifically object to the final written instructions means the objection to the language "unreasonably dangerous" has not been properly preserved for our review.

▮▮▮ Even if the alleged error had been properly preserved, it fails on the merits. Errors in jury instructions are considered as questions of law and are reviewed by this Court *de novo. Hamilton v. CSX Transportation, Inc.,* 208 S.W.3d 272, 275 (Ky.App.2006). Further, "[i]f the statements of law contained in the instructions are substantially correct, they will not be condemned as prejudicial unless they are calculated to mislead the jury." *Ballback's Adm'r v. Boland–Maloney Lumber Co.,* 306 Ky. 647, 652–653, 208 S.W.2d 940, 943 (1948).

The instruction Boland–Maloney complains of on appeal is "Jury Instruction No. # 3," which stated as follows:

In undertaking the framing of the stairway of the Citadel building, it was the **duty** of the defendant, Boland Maloney Lumber Company, to exercise **ordinary care** to frame the stairway in such a manner that the stairway was safe for its intended use. You will find for the Plaintiff ... if you are satisfied from the evidence that Defendant Boland Maloney Lumber Company, framed, built, and/or created, or allowed to be framed, built, and/or created an **unreasonably dangerous** stairway and that this was a substantial factor in causing Plaintiff's injuries.

(Emphasis added.) The instruction clearly set out Boland–Maloney's duty as one of ordinary care; however, the instruction included language about whether the stairway was "unreasonably dangerous." Boland–Maloney contends that the unrea-

sonably dangerous standard is solely employed in product liability cases where the standard is strict liability and that it was improper to include this terminology in the instruction.

Here, the instruction correctly states that the duty of care is one of "ordinary care," rather than strict liability. Although the *unreasonably dangerous standard* is limited to products liability cases, the *term* "unreasonably dangerous" may be found in various non-product liability cases and authorities in Kentucky. *See, e.g., Mason v. City of Mt. Sterling,* 122 S.W.3d 500, 509 (Ky.2003); John S. Palmore, *Kentucky Instructions to Juries,* § 24.02, (Comment) (5th ed. 2009); *see also* Palmore, *Kentucky Instructions to Juries* § 24.03, (Comment) (5th 3d. 2009). When not used in the product liability context, the term "unreasonably dangerous" is typically found in premises liability cases and is synonymous or interchangeable with such terms or phrases as "reasonably safe" or "unreasonable risk of harm." Although the present case is not a premises liability case, it is sufficiently comparable that the use of terms typically found in premises liability cases is not error. Indeed, this case is in some ways a hybrid between premises liability and a traditional ordinary negligence action.

One example of a case involving the use of "reasonably safe" or "unreasonably dangerous" terminology is *Majestic Theater Co. v. Lutz,* 210 Ky. 92, 275 S.W. 16 (1925). The case involved a fall on a stairway, and the following instruction was given to the jury:

> (1) It was the duty of the defendant ... to exercise ordinary car[e] to keep the steps leading up fròm the first floor thereof ... in a *reasonably safe condition* for the use of the public ... including the plaintiff.

*Id.* at 21 (emphasis added). Likewise, in *Mason v. City of Mount Sterling, supra,* the Kentucky Supreme Court quoted the Restatement (Second) of Torts, § 366 (1965), noting that,

> [o]ne who takes possession of land upon which there is an existing structure or other artificial condition **unreasonably dangerous** to persons or property outside of the land is subject to liability for physical harm caused to them by the condition....

*Id.* at 509 (emphasis added). Further, in *Scifres v. Kraft,* 916 S.W.2d 779 (Ky.App. 1996), this Court noted that a swimming pool "becomes **unreasonably dangerous** only when there is a hidden defect or dangerous condition posing a risk of death or serious bodily harm." *Id.* at 781 (emphasis added).

As the term "unreasonably dangerous" is often found instructed in cases other than products liability cases when dealing with an ordinary care standard, we cannot say that the trial court abused its discretion by using this terminology in the instruction. There is no indication from the instruction that the trial court was confusing strict liability with ordinary negligence, nor does it appear that the jury might have been misled to believe that strict liability was the standard. Accordingly, we affirm on this ground.

### E. Future Medical Expenses

█ Finally, we address Doug's argument on cross-appeal that he is entitled to a new trial on the issue of future medical expenses. Doug argues that the trial court improperly granted Boland–Maloney's *motion in limine* to exclude any evidence related to Doug's claim for future medical expenses (as it was not supported by expert testimony). The trial court stated in its order that "testimony regarding the appropriate amount of future medical

expenses or how one can arrive at a suitable economic number for the same is complicated, so as to require expert testimony." As previously stated, the standard of review on evidentiary errors is abuse of discretion. *Goodyear Tire and Rubber, supra.*

Here, testimony was offered by Dr. Robert Sexton and other doctors that Doug suffered from a seizure disorder which would likely require him to take anti-seizure medication for the remainder of his life. Although Dr. Sexton and the other doctors did not testify as to the amount of medication required or the likely cost of this medication over the remainder of Doug's lifetime, Doug entered the yearly cost of the prescription drugs by avowal.[3] Although the evidence presented would force the jury to speculate to a certain extent about the future cost of some of the prescribed medications, the evidence was sufficiently probative to support an award for future medical expenses. As such, we reverse on this ground and remand for a determination on the sole issue of future prescription medication expenses.

## Conclusion

For the foregoing reasons, the judgment of the Jefferson Circuit Court is hereby affirmed in part and reversed and remanded in part. We remand this case to the Jefferson Circuit Court for a new trial on the sole issue of future medical expenses.

ALL CONCUR.

---

3. The yearly cost for Doug's anti-seizure medication was shown to be $8,392.29.