RENDERED:  JANUARY 29, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1343-MR

CYNTHIA HAYES, as Executrix of the Estate
of DONNA ANN HAYES                                                 APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE ANGELA MCCORMICK-BISIG, JUDGE
ACTION NO. 16-CI-003503


COLGATE-PALMOLIVE COMPANY
and JOHNSON & JOHNSON                                              APPELLEES


OPINION
AFFIRMING IN PART, REVERSING IN PART,
AND REMANDING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; GOODWINE AND KRAMER,
JUDGES.

KRAMER, JUDGE:  For decades, Donna Hayes used talcum powder products

manufactured by appellees Johnson & Johnson ("J&J") and Colgate-Palmolive

Company ("Colgate").  On December 17, 2016, Donna passed away due to

mesothelioma. Cynthia Hayes, as the executrix of Donna's estate, filed suit against J&J and Colgate in Jefferson Circuit Court, alleging their talcum powder products contained asbestos; that the asbestos caused Donna's mesothelioma; and that J&J and Colgate were therefore liable for Donna's death. Her suit ultimately progressed to a jury trial, which culminated in a defense verdict.

On appeal, Cynthia raises three issues which, respectively, relate to (1) the jury instructions; (2) the trial court's decision to permit J&J to adduce what could be characterized as "personal use" testimony from its corporate representative; and (3) the trial court's decision to exclude evidence relating to a scientific article Cynthia wished to adduce. Upon review, we find no error relative to her first and third points. But, we hold that the trial court committed reversible error with respect to the second. Accordingly, we affirm in part, reverse in part, and remand for a new trial with respect to J&J.

## I. Jury Instructions

Cynthia takes issue with how the trial court instructed the jury regarding her claims of negligence against the appellees. Alleged errors in jury instructions are reviewed "*de novo* to determine whether the instructions were based upon the evidence and whether they properly and intelligibly state the law." *Combs v. Stortz*, 276 S.W.3d 282, 288 (Ky. App. 2009). "An error in a court's instructions must appear to have been prejudicial to the appellant's substantial

rights or to have affected the merits of the case or to have misled the jury or to have brought about an unjust verdict in order to constitute sufficient ground for reversal of the judgment." *Miller v. Miller*, 296 S.W.2d 684, 687-88 (Ky. 1956) (citation and quotation marks omitted). Here, the trial court's instruction was as follows:

## INSTRUCTION NO. 1
## NEGLIGENCE

It was the duty of Defendants Colgate-Palmolive and Johnson & Johnson to exercise ordinary care in the manufacture and distribution of the talcum powder products at issue in this case. "Ordinary care" means such care as you would expect an ordinarily prudent company engaged in the same type of business as Defendants to exercise under the same or similar circumstances. To find in favor of Plaintiff, Cynthia Hayes, you must be satisfied from the evidence that:

A. Donna Hayes was exposed to asbestos from one or more of the products designed, specified, prepared, manufactured, distributed, sold, and/or marketed by one or both of the Defendants;

AND

B. One or more of the talcum powder products at issue in this case *were not in a reasonably safe condition at the time they were sold* by Colgate-Palmolive and/or Johnson & Johnson;

AND

C. In the exercise of ordinary care, Colgate-Palmolive and/or Johnson & Johnson should have been aware of the product's unsafe condition;

-3-

AND

> D.  The product's unsafe condition was a substantial
> factor in causing Donna Hayes' injury.

(Emphasis added.)

Cynthia's arguments take issue with what is emphasized above.  Her first argument, in the words of her brief, is that "[a] finding that Appellees' product [sic] 'were not in a reasonably safe condition at the time they were sold' is an element of strict liability, not negligence.  Thus, it was error to include this element in the negligence instruction."

Cynthia is incorrect.  Any products liability theory based upon either strict liability or negligence is grounded in the principle that "[t]he manufacturer has a non-delegable duty to provide a product reasonably safe for its foreseeable uses[.]" *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 782 (Ky. 1984); *see also Ostendorf v. Clark Equipment Co.*, 122 S.W.3d 530, 535 (Ky. 2003) ("[U]nder either theory, it is the legal duty of a manufacturer to use reasonable care to protect against foreseeable dangers.").  Thus, contrary to Cynthia's understanding, both theories are conditioned upon the existence of a defective product (*i.e.*, a product that is not reasonably safe for its foreseeable uses).  Instead, the difference between strict liability and negligence lies in the element of *knowledge*:  "[N]egligence turns on actual knowledge of a defective condition unreasonably dangerous, or a condition which, under the exercise of

ordinary care, should have been discovered or foreseen. Conversely, strict liability may be imposed where the eventual defect or resulting harm was merely speculative or hypothetical at best." *Worldwide Equipment, Inc. v. Mullins*, 11 S.W.3d 50, 55 (Ky. App. 1999).

Next, Cynthia notes that "not reasonably safe" is largely interchangeable with the phrase "unreasonably dangerous" in the context of negligence.[1] And, citing *Nichols v. Union Underwear Co., Inc.*, 602 S.W.2d 429, 433 (Ky. 1980), she asserts that the Kentucky Supreme Court "requires" the phrase "unreasonably dangerous" to be defined in jury instructions. As such, she reasons the trial court erred by failing to define "not reasonably safe" in the jury instructions.

To be sure, the phrases "unreasonably dangerous" or "not reasonably safe" do contemplate a variety of evidentiary factors, such as "feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics[.]" *McCullough*, 676 S.W.2d at 780 (Ky. 1984). However, attempting to define those phrases in jury instructions can do more harm than

---

[1] *See, e.g.*, *Boland-Maloney Lumber Co., Inc. v. Burnett*, 302 S.W.3d 680, 691 (Ky. App. 2009) ("When not used in the product liability context, the term 'unreasonably dangerous' is typically found in premises liability cases and is synonymous or interchangeable with such terms or phrases as 'reasonably safe' or 'unreasonable risk of harm.'")

good, which is a point *Nichols* highlights.  There, contrary to Cynthia's understanding of that strict liability matter, the trial court was not reversed for *failing* to define "unreasonably dangerous."  It was reversed for providing an *inaccurate* definition which improperly limited the meaning of that phrase.[2]

In other words, *Nichols* typifies why our Supreme Court cautions against "instructions getting into evidentiary matters, subquestions which better practice suggests should be omitted from the instructions and left to the lawyers to flesh out in closing arguments."  *Ford Motor Co. v. Fulkerson*, 812 S.W.2d 119, 123 (Ky. 1991); *see also Cox v. Cooper*, 510 S.W.2d 530, 535 (Ky. 1974) ("Our approach to instructions is that they should provide only the bare bones, which can be fleshed out by counsel in their closing arguments if they so desire.").

Lastly, re-emphasizing her prior two arguments, Cynthia contends the jury instruction set forth above caused her to suffer prejudicial error.  To summarize, however, the use of "not reasonably safe" in the instruction did not misrepresent the applicable law; Cynthia cites no authority indicating the instructions were required to define that phrase; and, Cynthia was free to flesh out

---

[2] *See Nichols*, 602 S.W.2d at 432-33 ("It is clear that instruction four limited the jury to finding the product unreasonably [dangerous] if, and only if, it was more dangerous than an ordinary adult would expect it to be. . . .  We believe that consumer knowledge, the factor considered below, is only one of the factors that should be before the jury in determining whether a product is unreasonably dangerous.").

-6-

the meaning of "not reasonably safe" in her closing arguments. Accordingly, no error occurred in this respect.

## II. Personal use testimony

Cynthia takes issue with what she asserts was improper testimony from J&J's witness, John Hopkins, Ph.D. Hopkins is a toxicologist who was not employed by J&J, but rather by various J&J subsidiaries (*i.e.*, Johnson and Johnson United Kingdom; Johnson and Johnson Consume Inc.; and Johnson and Johnson France) for approximately twenty years during the 1970s through the 1990s. J&J did not offer him as an expert at trial. Instead, J&J offered him as its corporate representative and as the witness most qualified to speak on its behalf regarding (1) what it knew about the health hazards of asbestos exposure; (2) the general topic of cosmetic talc; and (3) J&J's policy that there is no place for asbestos in cosmetic talc. As to Dr. Hopkins' testimony at issue, the trial court permitted J&J, on direct examination, to ask Dr. Hopkins about his personal use of its product; and it allowed him to answer by stating he had no concerns about the safety, and by describing, at length, that he had not only used J&J's baby powder on himself throughout his lifetime but had also used it for decades on his three children and eight grandchildren.

J&J adduced this evidence of Dr. Hopkins' personal use of its talc products because, in its view, it was relevant to rebut Cynthia's punitive damages

claim. J&J asserted Cynthia had put its state of mind, intent, and motive directly at issue by contending it knew there was asbestos in its products and had concealed that information from the public and the FDA.[3] J&J argued that because Dr. Hopkins had been employed at various J&J subsidiaries for purposes of evaluating the safety of its talc products, he would have been aware of testing results on the talc used in J&J's products and would not have intentionally used an asbestos-containing product on himself and his family. The inference J&J sought to draw from Dr. Hopkins' personal use testimony was that Dr. Hopkins believed J&J's cosmetic talc products were safe. And, because Dr. Hopkins had been designated J&J's corporate representative and had been authorized to testify on its behalf, J&J reasoned his beliefs were effectively J&J's beliefs; and that this therefore indicated J&J lacked the motive or intent to knowingly conceal asbestos contamination.

Prior to trial, Cynthia sought to exclude this testimony as irrelevant and unduly prejudicial. To that effect, she pointed out in her motion *in limine* and at a related hearing that no evidence suggested Dr. Hopkins, who had only worked at J&J subsidiaries, had ever been a corporate decisionmaker at J&J; had ever personally tested J&J's talc for asbestos; or that J&J had even been aware of his personal use of its products. She argued that regardless of whether the jury was informed of Dr. Hopkins' status as a purely *fact witness*, his extensive experience

---

[3] United States Food and Drug Administration.

as a toxicologist, taken in conjunction with the insinuation that he *believed* J&J's talc products were safe, could nevertheless confuse jurors into treating him as an *expert* opining that J&J's talc products *are* safe. Further, she argued it would be impossible to effectively cross-examine Dr. Hopkins regarding the truth or consequences of his and his family's use of J&J's talc products without conducting what could amount to several collateral mini-trials.

As indicated, the trial court ultimately overruled Cynthia's objection. Moreover, the trial court limited the scope of what Cynthia could ask Dr. Hopkins about his personal use testimony on cross-examination, stating during the July 15, 2019 hearing on Cynthia's motion *in limine*, "I will not allow it to go into a mini-trial to go into whether [Dr. Hopkins] actually used it or not. I think the question should be asked, he can answer, and we can move on." The trial court further elaborated upon its decision, stating:

> Somebody has to speak on behalf of a corporate, corporation, and the corporate rep is designated for that and can bind the corporation. I think to the extent that Mr. [sic] Hopkins can say that he used it on whoever in his own family, you can certainly impeach him, if you think it can't possibly be the product that Ms. Hayes used, or in the time frame, or that. You can impeach him on that, but again, I think it's relevant to show intent, motive, bias.

Consistent with the trial court's decision, J&J thereafter alluded to Dr. Hopkins' above-described personal use testimony in its opening arguments;

-9-

elicited it at trial; and, in its closing arguments, J&J summarized and characterized it as follows:

> Let's talk about Vermont. You heard a lot from Dr. Hopkins about this because by the time he was starting to join the company, it was Vermont that was the source [of J&J's talc], so he has much more personal knowledge about that. Started working at Johnson and Johnson in 1976. And I put up here "actions speak louder than words" because I'm going to talk a little bit about that with Dr. Egilman,[4] too. He worked there, he's a toxicologist, he was intimately involved in talc safety issues. He used this product on himself, on his children, and on his grandkids. One of the questions you're gonna be asked here, and we'll get to that a little later, is punitive damages – the idea that you're just grossly reckless, did not care whether they hurt people. If that's true, how can that be true when you're using it on your own kids? We've heard from Mr. Satterley the idea that somehow he didn't know anything about talc when he was using it. This timeline shows you that's not true. By the time he was using it on his grandkids, he had been in multiple positions in charge of talc issues, been at the company for a, you know, decades.

On appeal, Cynthia asserts the trial court erred in admitting Dr. Hopkins' personal use testimony, and for the reasons she asserted prior to trial (*i.e.*, that it was irrelevant and unduly prejudicial). We agree.

We note at the onset that during the hearing on J&J's motion *in limine*, J&J's counsel acknowledged that litigation similar to this matter has taken place elsewhere in the United States; and that this was not the first time in this type

---

[4] Dr. David Egilman was Cynthia's causation expert.

of litigation that it has attempted to elicit testimony from Dr. Hopkins about his use of J&J talc products on himself and his family. As its counsel stated, "There have been cases where it's been let in, and there's been cases where it hasn't been let in." Notwithstanding, the legal arguments surrounding its admission have been largely consistent with the legal arguments put forth here.[5] And, the arguments against its admission are compelling.

We review a trial court's evidentiary rulings for abuse of discretion. *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007) (citing *Woodard v. Commonwealth*, 147 S.W.3d 63 (Ky. 2004)). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (quoting *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)).

As discussed, Cynthia argues Dr. Hopkins' testimony was irrelevant and thus inadmissible. *See* KRE[6] 401 and 402. To review, J&J argued Dr. Hopkins' testimony was a relevant reflection of its corporate state of mind for purposes of punitive damages. But, apart from citing caselaw delineating the general standard for admitting or excluding evidence, its argument was premised

---

[5] *See, e.g.*, *Johnson v. Johnson & Johnson*, No. 2018-CP-40-001781, 2019 WL 2358784 (S.C. Com. Pl.) (Trial Motion, Memorandum and Affidavit) (April 5, 2019); *Cabibi v. Johnson & Johnson*, No. BC665257, 2019 WL 9630553 (Cal. Super.) (Trial Motion, Memorandum and Affidavit) (July 22, 2019).

[6] Kentucky Rules of Evidence.

upon little more; namely: (1) a broad reference to CR[7] 30.02(6), which permits an entity to designate a person "to testify on its behalf . . . as to matters known or reasonably available to the organization"; (2) its own understanding that "corporate knowledge and opinions" are relevant to punitive damages in Kentucky; and (3) its limited reading of *Bose Corp. v. Ejaz*, 732 F.3d 17, 27 (1st Cir. 2013), which, as J&J emphasizes, stated:

> Bose points to several material differences between its Australian products and the American products that Ejaz sold in Australia. Those differences include region coding, which will keep an American DVD player from playing Australian DVDs and vice versa; electrical power requirements, which prevent American electronics from functioning on Australian power supplies and vice versa; capabilities of the remote controls; durations of the products' warranties; and the design and functionality of the products' radio tuners. *Evidence in the record, such as Bose's corporate representative's testimony based on his personal experience* and Ejaz's testimony in his deposition, as well as Ejaz's later admissions, supports that there are material differences in the products.

(Footnote omitted; emphasis supplied.)

As an aside, the corporate representative in *Ejaz* provided "personal experience" testimony to reflect his *knowledge* (*i.e.*, what he knew of the objective differences between Bose's American and Australian products). Indeed, *knowledge* is the common thread between *Ejaz*, CR 30.02(6), and Kentucky's

---

[7] Kentucky Rule of Civil Procedure.

-12-

punitive damages statute, KRS[8] 411.186.  And, there is little controversy in the

principle that a corporation's knowledge may be ascertained through the

knowledge of its agents.  *See Devasier v. James*, 278 S.W.3d 625, 631 (Ky. 2009)

(noting "the general principle of law that knowledge or notice to an agent is

imputed to the principal.").

*Knowledge* was likewise at issue in Cynthia's punitive damages claim

against J&J.  Specifically, KRS 411.186(a)-(e) required the trier of fact to assess

whether J&J – as a corporate whole – had made an *informed* decision to sell what

it deemed a safe product.  To that end, the science relating to J&J's product was

relevant, *e.g.*, what J&J knew, when it knew it, and the extent to which it kept itself

informed.

But, Dr. Hopkins' personal choice to use J&J's talc products had no

bearing upon J&J's mindset, or upon what the trial court characterized as J&J's

"intent, motive, bias."  Indeed, none of J&J's cited authorities stand for the

proposition that – like *knowledge* – the *subjective belief, opinion, or personal*

*choice* of an agent is imputed to the principal; after all, an individual stating a

personal choice is speaking for himself, not as the representative of someone else.

Dr. Hopkins' testimony was likewise irrelevant because a company

executive's reasons for using the company's product may reflect a myriad of

---

[8] Kentucky Revised Statute.

-13-

interests that have nothing to do with a collective corporate conscious determination that the product is safe. Executives might have a greater tolerance for risk, for example; or, they might wish to display loyalty to the company above other concerns. This type of self-serving anecdotal evidence has no evidentiary value, given the numerous reasons why a company executive or long-time employee might use their company's product regardless of the risks to themselves and their families – or at least claim that they did so under direct examination by the company's attorneys.

Additionally, Cynthia argued Dr. Hopkins' testimony was unduly prejudicial. *See* KRE 403. And, while no Kentucky authority has addressed the subject of a corporate representative's "personal use" testimony in relation to KRE 403, we agree. Citing equivalent federal law, federal decisions have explained how personal use testimony by defense witnesses leads to unwarranted and lengthy mini-trials and a substantial risk of confusing the jury.[9]

---

[9] Despite the unpublished status of the various federal orders cited herein, we cite them as persuasive authority regarding KRE 403. Federal Rule of Evidence (FRE) 403 is "virtually identical" to KRE 403. *See Anderson v. Commonwealth*, 281 S.W.3d 761, 764, n.10 (Ky. 2009). "It is well established that Kentucky courts rely upon Federal caselaw when interpreting a Kentucky rule of procedure that is similar to its federal counterpart." *Hensley v. Haynes Trucking, LLC*, 549 S.W.3d 430, 436, n.4 (Ky. 2018) (citations omitted). And, in accordance with Federal Rule of Appellate Procedure (FRAP) 32.1, "A court may not prohibit or restrict the citation of federal judicial opinions, orders, judgments, or other written dispositions that have been: (i) designated as "unpublished" . . . and (ii) issued . . . after January 1, 2007." While Kentucky courts are not bound by FRAP 32.1 or federal cases interpreting Kentucky law, the federal judiciary has determined that all of its opinions rendered after January 1, 2007, have equally persuasive import without regard to their designation as unpublished.

*In re Yasmin and Yaz*,[10] for example, involved claims that Bayer had manufactured harmful oral contraceptives. There, Bayer proffered "testimony from its present and former employees pertaining to the employees' personal use (or their family members' personal use) of the oral contraceptives[.]" *Id*. at *1. The court found that this type of personal use testimony was inadmissible because:

> Even if one were to conclude that such evidence was relevant, the Court finds that the prejudice to the plaintiffs far outweighs any probative value gleaned from introducing the evidence. It would be highly prejudicial for the jury to hear from some people who say they take the product, have their daughters take the product and haven't [had] one day of health problems as a result of it. On the other hand, where is the probative value from anecdotally taking an infinitesimal number of patients out of the entire patient population who have not had any problems with the product when the theory is not that every patient has problems, but that more than is advertised or warned will have problems and more than the FDA was led to believe would have problems? On balance, the evidence should not come in.

*Id*. The Court also added that if such defense testimony were allowed, it would effectively require an equivalent amount of mini-trials for purposes of impeachment and rebuttal. The plaintiffs would be permitted to discover and prove "the relevant medical histories of each current or former employee that has

---

[10] *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Relevant Products Liability Litigation*, No. 3:09-MD-02100-DRH, 2011 WL 2650948 (S.D. Ill. June 29, 2011).

testified regarding personal use of the subject drugs or any witness that Bayer intends to offer at trial for that purpose." *Id*. at *2.

In *In re Xarelto*,[11] the defendants were sued for manufacturing an allegedly harmful anticoagulant drug. The defendants proffered testimony about "the anticoagulant use (including Xarelto) and the associated medical treatment and condition of their employees including Dr. Theodore Spiro and Dr. Peter Dibattiste, as well as the family members of certain employees including Dr. Spiro's wife, Dr. Gary Peters' wife, Nauman Shah's mother, and Susan Geiger's father." *Id*. at *1. The *Xarelto* Court similarly excluded the proffered testimony as unfairly prejudicial, while allowing for potential reconsideration only if the defendants produced all relevant medical records pertaining to the defense witnesses and their families for purposes of cross-examination, explaining:

> Each person who takes Xarelto is different, and the circumstances are different. In fairness, there ought to be some testing of the specific circumstances of that person if the Defendants wish to bring up this issue at trial. Accordingly, Defendants will not be permitted to elicit information about a witness' family member taking Xarelto without producing their medical records.

*Id*. at *2.

---

[11] *In re Xarelto (Rivaroxaban) Products Liability Litigation*, No. MDL 2592, 2017 WL 2780760 (E.D. La. May 26, 2017).

Likewise, in *In re: Tylenol*,[12] where manufacturers of Tylenol were sued because Tylenol caused liver damage, the defendants also proffered personal-use testimony by their employees. *Id*. at *3-4. Drawing a distinction from the plaintiff's own relevant personal use of the product, the *Tylenol* Court found that the defense witnesses' personal use testimony was inadmissible because "the prejudice that such testimony may cause substantially outweighs any probative value it may have." *Id*. at *4. Accordingly, the Court excluded it for the same reasons elucidated in *Yasmin* and *Xarelto*.

Here, the trial court unduly prejudiced Cynthia's case against J&J. It allowed J&J to elicit irrelevant personal and family use testimony from its witness, Dr. Hopkins. His irrelevant testimony gave rise to an unnecessary distraction by putting the medical histories of those individuals at issue. Further compounding its error, the trial court then effectively shielded Dr. Hopkins' testimony by precluding Cynthia from examining the medical histories of the individuals implicated in Dr. Hopkins' testimony and instead limiting the scope of Cynthia's permissible cross-examination to, in the trial court's words, "the extent that Mr. [sic] Hopkins can say that he used it on whoever in his own family, . . . [or] if you think it can't possibly be the product that Ms. Hayes used, or in the time frame, or that."

---

[12] *In re: Tylenol (Acetaminophen) Marketing*, No. 2:12-cv-07263, 2016 WL 3125428 (E.D. Pa. June 3, 2016).

In its appellate brief, J&J downplays the significance of Dr. Hopkins' testimony:

> Plaintiff is wrong in arguing that this testimony was unduly prejudicial. Plaintiff first asserts that this testimony encouraged the jury to disregard the experts on issues of contamination and safety. But J&J's position was amply supported by extensive expert evidence regarding both the safety of J&J cosmetic talc and the thoroughness and reliability of J&J's testing. Further, both J&J and plaintiff's counsel reminded the jury that Dr. Hopkins was not an expert.

(Record citations omitted.)

Conspicuously, though, J&J stops short of arguing that Cynthia did not *also* adduce expert evidence in support of her contrary positions "regarding both the safety of J&J cosmetic talc and the thoroughness and reliability of J&J's testing," or that it was otherwise entitled to judgment as a matter of law based upon the sufficiency of the evidence presented. And that, in turn, highlights the primary reason why Dr. Hopkins' testimony was unduly prejudicial and why the trial court's error in admitting it was substantial.[13] Despite his non-expert disclaimer[14] and regardless of any *words* that Cynthia's experts offered to the effect that J&J's

---

[13] *See* CR 61.01.

[14] It is unclear whether J&J considers its concession to the jury – namely, that Dr. Hopkins was *not* an expert – qualified as some form of curative limiting instruction with respect to his personal use testimony. If so, J&J is incorrect. Limiting instructions only apply where evidence "which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted[.]" KRE 105(a). As set forth above, Dr. Hopkins' personal use testimony was not, as presented at trial, admissible for *any* purpose.

-18-

products were unsafe, the jury was made aware that Dr. Hopkins is a preeminent toxicologist who evaluated safety issues concerning J&J's talc products. The jury heard about Dr. Hopkins' *actions*, *i.e.*, that he was so certain of the safety of J&J's talc products that he essentially staked the health of his family on it for decades. And, as J&J's counsel repeatedly emphasized during closing arguments, "*actions speak louder than words*." Stated differently, Dr. Hopkins' non-expert personal use testimony unfairly detracted from the weight of Cynthia's expert testimony. Expert testimony was the *sine qua non* of this litigation.

The trial court abused its discretion in allowing this testimony, and this error was not harmless. Accordingly, we reverse and remand for a new trial.

### III. Exclusion of "The Gordon Paper"

The last issue Cynthia raises on appeal involves what Cynthia refers to as the "Gordon Paper." It is a 2014 article entitled "Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women," authored by Ronald E. Gordon, Sean Fitzgerald, and James Millette, and published in volume 20, pp. 318-332 of the *International Journal of Occupational and Environmental Health*. The article's stated purpose was to "investigate one historic brand of cosmetic talcum powder associated with mesothelioma in women." While not identified in the article, the parties in this matter acknowledge the "brand" purportedly "investigated" in the article was Colgate's Cashmere Bouquet – a

product at issue in this litigation that Donna allegedly used from 1963 through the 1970s. The article also confirms that one of the talc sources for the brand tested was Val Chisone, Italy – one of the two sources of talc used in the J&J products at issue here. In sum, the Gordon Paper combines and details testing performed by the three authors in their respective laboratories on "50 containers of this cosmetic talcum powder product of different sizes and colors, produced over a 50-year time span to determine the presence of asbestos."

Specifically, Gordon analyzed 50 samples "using transmission electron microscope (TEM) methods;" Fitzgerald "assessed asbestos releasability" of three samples using his "glovebox" method; and Millette tested nine samples, and further conducted "air testing" in a simulated bathroom. The authors reported that each of them "confirmed in multiple tests the presence of asbestiform anthophyllite and asbestiform tremolite in the talcum powder products." The authors also reported the results of their analyses of "[t]issue samples from a woman with no other known exposure to asbestos other than her use of the product tested[.]" Based on these results, the article concluded that the tested brand "contained asbestos and the application of talcum powder released inhalable asbestos fibers."

Prior to trial, the appellees moved to preclude Cynthia from introducing the Gordon Paper as substantive evidence of her claims, either by

discussing it with her experts during their trial testimony or by utilizing it for cross-examination purposes. They noted the article was undisputedly hearsay and further argued that KRE 803(18) and KRE 703 – the two evidentiary rules advocated by Cynthia for nevertheless admitting the article as substantive evidence – were inapplicable for "lack of foundation."

As an aside, both KRE 703 and KRE 803(18) permit hearsay to be placed before a jury at trial, subject to foundational requirements. One such requirement – reliance – was a predominant focus of the appellees' motions *in limine*. In relevant part, KRE 703 provides:

> (b) If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, *facts or data relied upon by an expert* pursuant to subdivision (a) may at the discretion of the court be disclosed to the jury even though such facts or data are not admissible in evidence. Upon request the court shall admonish the jury to use such facts or data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

(Emphasis added.)

Whereas, KRE 803(18) provides:

> Learned treatises. *To the extent* called to the attention of an expert witness upon cross-examination or *relied upon by the expert witness in direct examination*, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the

-21-

> statements may be read into evidence but may not be
> received as exhibits.

(Emphasis added.)

Here, with respect to the Gordon Paper, the appellees maintained that KRE 703 and KRE 803(18) were inapplicable for the same reasons: None of Cynthia's experts had *relied* upon it to form their own opinions, and none of their own experts deemed it reliable authority. Absent that, the appellees were concerned Cynthia was merely attempting to introduce the Gordon Paper as a means of injecting into the trial the expert opinions – on the ultimate issues presented in this matter – of three non-testifying experts who would not be subject to cross-examination.

Ultimately, the trial court granted the appellees' motions, agreeing that Cynthia lacked a foundation. During the February 28, 2019 hearing on the appellees' motions *in limine* on this subject, the trial court elaborated upon its ruling:

> Let's say these three write this report, and you're saying
> the court shouldn't discount it even if it was written for
> what we would call "plaintiff's lawyers." I would agree
> with you that that wouldn't exclude it.[15] But if it goes

[15] Undisputedly, the three authors of the Gordon Paper – Gordon, Fitzgerald, and Millette – have functioned as expert witnesses for plaintiffs in asbestos litigation. As the article itself explicitly sets forth, they also "became aware of one another's work through litigation," and their respective contributions to the article were "paid for by attorneys for litigation purposes." This point, among others, was cited by the appellees as a separate basis for not regarding the Gordon Paper as a "learned treatise" pursuant to KRE 803(18), and the appellees make the same argument on appeal. But, as what is quoted tends to indicate, this point was not the focus of why

to, if the source of this Gordon article, and from reading your papers I thought it may, it's not being relied upon by an expert, from what I can tell, for general scientific information about a principle that's at issue in this case. But, the conclusions of the paper go to the very issue that the jury would have to decide, which is whether there was asbestos in the talc, whether there's evidence to show that it would have been in Ms. Hayes.

And so, to me, it seems somewhat different if you're looking at an opinion that goes to the very issues of the case that's being offered by someone outside of court verses an opinion that is foundational, or somehow underlies, a doctor's analysis of an issue. And that's the difference I see.

So it's not necessarily the purpose for which it's created because I think scientists, hopefully, are going to be scientists, and regardless of who's asking them to do the work or write the paper, they're looking at what the science tells them, but I guess the issue I had when I read these papers, with the Gordon Paper, is just that the conclusions are conclusions that are helpful, but aren't necessarily part and parcel of a bigger conclusion by Dr. Eigleman, but a conclusion that you would like. And if you would, then, present someone to say that, rather than have him give the conclusions of their paper. It really goes to the subject matter of the paper and what, for what purpose you are proffering that evidence. So, if you are proffering it for the purpose of a doctor's reliance because of his conclusions, to me that's different than if you are proffering it for the purpose to prove or disprove an issue that the jury needs to make a determination about.

the trial court excluded the Gordon Paper; and because we agree with why the trial court *did* exclude the Gordon Paper, we need not address it.

-23-

In short, the trial court found no indication that Cynthia's experts, in reaching their own conclusions regarding respirable asbestos in the appellees' products, had relied upon any "facts or data" set forth in the Gordon Paper; and it found every indication that Cynthia only wished to introduce the Gordon Paper for its ultimate conclusions. Accordingly, the trial court excluded the Gordon Paper. Rather than "illuminating" the opinion testimony of Cynthia's experts per KRE 703(b), the trial court believed the introduction of the Gordon Paper would only serve to obscure it.

Now on appeal, Cynthia asserts the trial court erred in this respect. In her brief, she argues:

> The trial court acknowledged the Gordon Paper addressed a central issue in the case: whether Colgate's talc contained respirable asbestos fibers. Moreover, the Appellees, particularly Colgate, never denied the Gordon Paper was relevant.
>
> Indeed, the Gordon Paper is relevant because it rendered critical genuine issues of fact more probable. *It demonstrated* that cosmetic talc contains asbestos. *It proves* that respirable asbestos fibers were released when Donna used cosmetic talc. *It also proved* that the asbestos fibers in her tissue were the kind detected in both Appellees' products.
>
> More importantly, *the Gordon study directly refutes* the Appellees' defenses that exposure to cosmetic talcum powder does not cause mesothelioma. Both in opening and closing argument, J&J vehemently argued that talc did not cause mesothelioma because "millions of people" use talc yet mesothelioma was a rare disease. *The*

> *Gordon Paper refutes* this argument by demonstrating dozens of talc users developed mesothelioma from their use of cosmetic talcum powder. Because it tended to prove Cindy's claims and refuted the Appellees' key defenses, its exclusion was unduly prejudicial.

(Internal footnotes omitted; emphasis added.)

Also, Cynthia adds throughout her brief the Gordon Paper was "reliable" because it was "peer reviewed and published."

To be clear, however, "peer reviewed and published" are not the magic words of admissibility. Suffice it to say – without delving into the several questions the appellees have raised regarding who the peer reviewers of the Gordon Paper were, and where the article was published – that peer review and publication are simply some of the factors for the trial court to consider when exercising its discretion to admit or exclude scientific evidence. *See, e.g.*, *Thompson*, 11 S.W.3d at 578-79. Furthermore, where the Gordon Paper appeared, or who paid its authors to write it, are not the issue.

The running theme of Cynthia's argument on appeal continues to be that the Gordon Paper should have been admissible because it was "reliable" and accomplished the above-emphasized evidentiary feats *all by itself*. However, the dispositive issue is not whether the Gordon Paper was *reliable*, but whether and how it was *relied upon*. The crux of the trial court's ruling, and the proper state of the law, is that absent judicial notice – which was not forthcoming in this matter –

-25-

KRE 703 and KRE 803(18) only apply to material actually relied upon or recognized by the testifying experts, either to form or explain their own opinions; and that an expert does not rely upon that material if he only parrots it, or cites it for the mere proposition that some other non-testifying expert arrived at the same ultimate conclusion. *See, e.g.*, *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006) (rejecting the premises that FRE[16] 703, the federal corollary to KRE 703, "extends so far as to allow an expert to testify about the conclusions of other experts[,]" or "bolster his opinion testimony by testifying that a non-testifying expert's conclusions were essentially the same[,]" or "circumvent the rules of hearsay by testifying that other experts, not present in the courtroom, corroborate his views." (citations omitted)).

Furthermore, as illustrated in *Hawkins v. Rosenbloom*, 17 S.W.3d 116 (Ky. App. 1999), it is difficult to overstate the substantial prejudice that can result from allowing an expert witness or "learned treatise" to effectively become a conduit for the opinion of a non-testifying expert. There, the successful party at trial had obtained a letter from his non-testifying expert, Dr. Ellison; the letter set forth Dr. Ellison's opinions on one of the central issues of the case (*i.e.*, the applicable standard of care); and during trial, the successful party was permitted to read from the letter and effectively introduce Dr. Ellison's expert opinions for

---

[16] Federal Rule of Evidence.

purposes of cross-examination. Upon review, this Court explained that "[e]ssentially, Dr. Ellison was allowed to testify without . . . counsel listing him as an expert witness or providing Civil Rule 26 disclosure[,]" which effectively permitted "Dr. Ellison to testify in court without being subject to cross-examination[.]" *Id.* at 121.

Here, to the extent that Cynthia insinuates any of her own experts relied upon the Gordon Paper to form or explain their own opinions in this matter, she provides only a single unsupported and perfunctory statement on the last page of her brief, *i.e.*, that that one of her experts, Dr. William Longo, "would have advised he modified his methodology based upon this peer reviewed paper." That is not enough. Absent any examination of the testimony Dr. Longo may have given – by avowal or otherwise – regarding whether or in what way he may have relied upon the Gordon Paper to form or explain his own opinion, this Court cannot say that the trial court abused its discretion in excluding the Gordon Paper, or that the exclusion of the Gordon Paper affected Cynthia's substantial rights. *See* CR 61.01. And, it is not the responsibility of this Court to search the enormous record before us to find support for her contentions, assuming it exists. *Smith v. Smith*, 235 S.W.3d 1, 5 (Ky. App. 2006). Consequently, the trial court's decision to exclude the Gordon Paper is not a basis of reversible error.

## CONCLUSION

Consistent with what is set forth above, we AFFIRM IN PART,

REVERSE IN PART, and REMAND for further proceedings not inconsistent with

this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Joseph D. Satterley
Paul J. Kelley
Paul J. Ivie
J. Eric Kiser
J. Garrett Cambron
Louisville, Kentucky

BRIEF FOR APPELLEE, COLGATE-PALMOLIVE COMPANY:

J. Wesley Earnhardt
New York, New York

Matthew W. Breetz
Bethany A. Breetz
Frederick R. Bentley III
Louisville, Kentucky

BRIEF FOR APPELLEE, JOHNSON AND JOHNSON:

Robert M. Loeb
Upnit K. Bhatti
Washington, D.C.

Darren Pouliot
New York, New York

Brantley C. Rowlen
R. Scott Masterson
Savannah, Georgia