RENDERED: JANUARY 26, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0935-MR

TIMOTHY WILLIAMS          APPELLANT

APPEAL FROM BOONE CIRCUIT COURT
v.        HONORABLE JAMES R. SCHRAND, II, JUDGE
ACTION NO. 15-CI-01028

CABINET FOR HEALTH AND
FAMILY SERVICES          APPELLEE

AND

NO. 2022-CA-1360-MR

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES          APPELLANT

APPEAL FROM BOONE CIRCUIT COURT
v.        HONORABLE JAMES R. SCHRAND, II, JUDGE
ACTION NO. 15-CI-01028

TIM WILLIAMS          APPELLEE

** ** ** ** **

BEFORE:  CALDWELL, GOODWINE, AND LAMBERT, JUDGES.

GOODWINE, JUDGE:  Timothy Williams ("Williams") appeals the June 30, 2022 judgment of the Boone Circuit Court denying his claims under the Kentucky Open Records Act ("KORA").  The Cabinet for Health and Family Services ("Cabinet") separately appeals the July 25, 2022 judgment awarding Williams $2,000,000 in punitive damages under the Kentucky Whistleblower Act ("KWA").  The Cabinet also appeals the trial court's February 18, 2022, and October 25, 2022 orders.  After careful review, we affirm the judgment in appeal No. 2022-CA-0935-MR.  In appeal No. 2022-CA-136-MR, we affirm, in part; reverse, in part; and remand.

## BACKGROUND

Williams has been employed by the Cabinet in the Department for Community Based Services ("DCBS") since 2001.  He has been a Family Services Office Supervisor ("FSOS") since 2012.[1]  Williams has worked in the Northern Bluegrass Region for the entirety of his tenure with DCBS and remains employed

---

[1] Within DCBS, an FSOS supervises social workers, the Service Region Administrator Associate ("SRAA") supervises the FSOSs, and the Service Region Administrator ("SRA") supervises the SRAAs.

there as an FSOS. He lives in Boone County, Kentucky and works at an office in Gallatin County, Kentucky.

In early 2015, Williams and another FSOS found that ninety-three cases in Boone County were assigned to social workers who were no longer employed by the Cabinet, meaning the cases had no ongoing social worker. Of the ninety-three, twelve cases were never initiated, meaning a social worker had not contacted the subject-family. At the time, Boone County was experiencing high turnover and was struggling to keep the office staffed. Williams described the state of the office as chaotic. He reported the unassigned and uninitiated cases to the SRA. Soon thereafter, staff in the region began working to resolve the backlog of cases. As part of the Cabinet's response to the case backlog, Williams was temporarily reassigned to the Boone County office on April 2, 2015, for a period of sixty days.

In April 2015, Paula Brun, an FSOS in Boone County, interviewed for a vacant SRAA position. She was promoted to the position on May 5, 2015. After her promotion, because of staffing issues in the Boone County office, she continued to perform the duties of both an FSOS and SRAA. After her promotion, Brun was Williams' supervisor during his temporary reassignment.

On April 27, 2015, Williams sent a letter of concern to the Cabinet's Office of Inspector General ("OIG"). He expressed concern about management of

the Northern Bluegrass Region. He informed the OIG of the uninitiated and unassigned cases. He specifically named Brun and alleged she lied about her case consult notes. On May 21, 2015, Williams sent a letter to the Commissioner's office alleging retaliation by his supervisors, Brun and Lisa Prewitt, the SRA.

When he was reassigned, Williams was given a new team of social workers to supervise. His Boone County team was less experienced than his prior Gallatin County team. Williams alleged, despite their inexperience, his workers were assigned more cases than other teams. His team was required to work 3.5 hours of overtime per week. The Cabinet argued every team, including Williams,' with past due cases was required to work overtime. While he was assigned to Boone County, two of Williams' supervisors entered his office when he was not present and removed case files. He claimed they left his office in disarray. He also alleged he was "micromanaged" by his supervisor after sending the letter to the OIG.

Brun resigned from her position with the Cabinet on June 1, 2015. Also in June, the Cabinet extended Williams' temporary reassignment to Boone County for an additional sixty days. Williams claims he received an email on May 4, 2015, from the SRA informing him his transfer would be permanent. However, at the end of his reassignment, Williams returned to Gallatin County on August 3,

-4-

2015.  Williams was never permanently transferred, either voluntarily or involuntarily.

On August 4, 2015, Williams filed a complaint in the Boone Circuit Court alleging violations of the KWA by the Cabinet.  On September 8, 2015, he amended his complaint to request a writ of mandamus for alleged violations of the KORA.[2]  The Cabinet unsuccessfully moved for summary judgment on both counts.

First, the court conducted a four-day bench trial to adjudicate Williams' KORA claim.  The court heard testimony from Jacqueline Ligon (Lafollette), Kathy Sansbury, Kelly Pompilio, Jason Mellenkamp, Williams, Linda Wilson, Jennifer Wolsing, Wade Hester, Prewitt, Lisa Dennis, and James Cundy, Ph.D.  At trial, Williams claimed he made several open records requests to which the Cabinet responded improperly in violation of the KORA.  He claimed his requests were "thwarted, refused, subverted, destroyed, or outright refused" by the Cabinet.  Record ("R.") at 1560.  The Cabinet argued it "took reasonable steps to respond to Williams' numerous and complex requests."  *Id.*  Based upon the evidence presented at trial and memoranda of the parties, the trial court found,

> As noted above the [c]ourt cannot find [the Cabinet's]
> actions in responding to and/or failing to provide
> requested documents pursuant to Williams' KORA

---

[2] The trial court dismissed Williams' claims of emotional distress and humiliation.  They are not at issue on appeal.

requests were willful. As [the Cabinet] admits, they were negligent in certain of their responses, however for Williams to prevail on his claim in Count II, that [the Cabinet] violated the KORA, he must prove their conduct was willful, which he did not do. Additionally, as to any claim that records Williams alleges still have not been provided, [the Cabinet] claims they have produced all records that exist. Wolsing testified she has reviewed approximately 6,000 pages of documents and produced between 4,000-5,000 pages in response to Williams' 15-20 open records requests or in discovery that are responsive to his requests. The [c]ourt cannot find Williams has made a prim[a] facie showing any additional records exist.

*Id.* at 1576-77. The parties did not file post-judgment motions. Appeal No. 2022-CA-0935-MR followed.

Following the four-day bench trial on Williams' KORA claims, a four-day jury trial was conducted on Williams' KWA claims. The parties presented testimony from Andrea Day, Jacqueline Lafollette, Karey Cooper, Felicia Ross, Jennifer Hauser, Jason Mellenkamp, Lisa Dennis, Brun, Prewitt, Williams, and Howard Klein. During the trial, the Cabinet twice moved for a mistrial and moved for a directed verdict both at the close of Williams' case and at the close of evidence. All were denied by the trial court.

After deliberation, the jury returned a verdict in favor of Williams. The jury found: (1) Williams made good faith reports to an appropriate authority; (2) the Cabinet took or threatened to take action to discourage or punish Williams for his reports; (3) Williams' reports were a contributing factor to the actions the

-6-

Cabinet took against him; and (4) the Cabinet did not prove Williams' reports were not a material factor in the actions taken against him. The jury awarded Williams $2,000,000 in punitive damages.

The Cabinet moved for a judgment notwithstanding the verdict ("JNOV") which was denied by the trial court. Appeal No. 2022-CA-1360-MR followed.

Additional facts will be developed as necessary in the analysis below.

## ANALYSIS

Because these appeals arise from distinct statutes, rely on discrete facts, and were independently briefed, we will address them separately.

APPEAL NO. 2022-CA-0935-MR

Williams appeals from the trial court's June 30, 2022 judgment finding he did not prove the Cabinet willfully withheld any records he requested under KRS[3] 61.882(5).

Before we reach Williams' arguments, we will address the Cabinet's claim that his brief is deficient under the Kentucky Rules of Appellate Procedure ("RAP") and, as such, should be stricken under RAP 10(B)(3). Specifically, the Cabinet alleges (1) Williams does not cite to the video record as required by RAP 24(A)(4); (2) his statement of the case erroneously cites to his brief's appendices

___

[3] Kentucky Revised Statutes.

rather than the record in violation of RAP 32(A)(3); and (3) his brief does not contain a word count certificate as required by RAP 15. The Cabinet argues it "cannot readily ascertain what issues Williams appeals herein." Appellee's Brief at 8.

Appellate procedural rules, including those for briefing, cannot be ignored by appellate advocates. *See Hallis v. Hallis*, 328 S.W.3d 694, 696 (Ky. App. 2010) (citation omitted). "They are lights and buoys to mark the channels of safe passage and assure an expeditious voyage to the right destination." *Id*. Because of the importance of adherence to these rules, this Court may penalize a party, including striking his brief or portions thereof, for failure to substantially comply with the rules. RAP 10(B).

Here, although Williams' brief does not strictly comply with the rules, it does substantially comply with them. The Cabinet is correct that his citations are to transcripts of the video record rather than to the record itself. "The official electronic recording of court proceedings is the official record for appeal." RAP 24(A)(3). "A transcript included in the evidentiary appendix does not take the place of an official video record." RAP 24(A)(4). Parties should cite to the official video record of proceedings in their briefs. In choosing to cite to transcripts which far exceed the length allowed for an evidentiary appendix rather than to the video record, Williams violated RAP 24(A), RAP 32(A)(3), and RAP

32(E)(2). Despite these violations, Williams provides the necessary citations to allow our review to proceed.

Furthermore, on the cover of his brief, Williams' counsel certified "this Brief contains 5,963 words, as measured by a word-processing application." Appellant's Brief at 1. Although counsel failed to include all information required by RAP 15(E), we find Williams has substantially complied with the rule.

Although we will proceed with our review of the merits of Williams' appeal because he substantially complied with the RAP, we caution counsel to be mindful of the importance of compliance with all procedural rules.

On appeal, Williams argues: (1) he timely appealed the Attorney General's opinion relating to Sansbury's emails; (2) the trial court misapplied the appropriate legal standard in its order; and (3) the trial court's finding that the Cabinet did not willfully withhold records was clearly erroneous. A trial court's decision as to whether an agency acted willfully under KRS 61.882(5) will not be disturbed unless it is clearly erroneous. *Bowling v. Lexington-Fayette Urban County Government*, 172 S.W.3d 333, 343-44 (Ky. 2005) (citations omitted).

First, Williams argues he timely appealed the Attorney General's opinion relating to Sansbury's emails. *See In re: Kelly Wiley/Cabinet for Health and Family Services*, Ky. Op. Att'y Gen. 15-ORD-144, 2015 WL 4850428 (Aug. 6, 2015). "A party shall have thirty (30) days from the day that the Attorney

General renders his or her decision to appeal the decision." KRS 61.880(5)(a). The Attorney General opinion was rendered on August 6, 2015. Williams argues he appealed the opinion in his amended complaint filed on September 8, 2015. Because the thirtieth day fell on a weekend and Labor Day was September 7, 2015, Williams is correct that he filed his amended complaint within the time allowed by statute.

However, his amended complaint does not contain an appeal of the Attorney General's opinion. "A pleading which sets forth a claim for relief . . . shall contain (a) a short and plain statement of the claim showing that the pleader is entitled to relief and (b) a demand for judgment for the relief to which he deems himself entitled." CR[4] 8.01(1). We must liberally construe a complaint to determine whether it states a cause of action. *Russell v. Johnson & Johnson, Inc.*, 610 S.W.3d 233, 241 (Ky. 2020) (citation omitted). While it is unnecessary to "state a claim with technical precision[,]" a complaint must give fair notice to the defendant. *Id*. (citation omitted).

The only reference Williams makes to the Attorney General's opinion in his amended complaint is as follows:

> Those requests for records, related to his complaints and those of a co-worker have been thwarted, refused, subverted, destroyed or outright refused by the Cabinet

---

[4] Kentucky Rules of Civil Procedure.

for Health and Family Services. (See Attached Attorney General Opinion 15-ORD-144).

R. at 39. At best, this single reference reads as a citation to evidence supporting another claim, not a separate claim or appeal of the opinion. Even with the most liberal construction, this does not comply with CR 8.01(1). Because Williams failed to appeal the opinion, it now has the "force and effect of law" and is enforceable in the trial court. KRS 61.880(5)(b).

Next, Williams argues the trial court misapplied the appropriate legal standard in its order. However, he does not identify either the legal standard erroneously applied by the court or the standard which should have been applied. He also refers us to no supportive authority for this argument. *See* RAP 32(A)(4). It is not the place of an appellate court to research and construct a party's legal argument or to "go on a fishing expedition to find support for their underdeveloped argument." *Jones by and though Jones v. IC Bus, LLC*, 626 S.W.3d 661, 686 (Ky. App. 2020). We decline to do so here.

In order for Williams to prevail, he had to prove the Cabinet willfully withheld documents in violation of KORA. KRS 61.882(5). The trial court concluded it was unable to find the Cabinet's "actions in responding to and/or failing to provide requested documents to Williams' KORA requests were willful." R. at 1576. Therefore, the trial court applied the correct standard.

Finally, Williams argues the trial court's finding that the Cabinet did not willfully withhold documents was clearly erroneous. Within this argument, Williams claims: (1) the ombudsman's report was not preliminary and should have been provided upon his request; (2) the Cabinet withheld emails from Kelly Pompilio, Pam VonHandorf, and Karey Cooper; and (3) it is "facially implausible" that Kathy Sansbury's emails were destroyed 28 days after her employment with the Cabinet ended. We will consider each of these allegations individually.

First, Williams contests the Cabinet's characterization of the ombudsman's report as preliminary under KRS 61.878(1)(i). As noted in the trial court's order, Williams testified at the May 24, 2015 hearing that he was not contesting the Cabinet's invocation of these exceptions. Video Record ("V.R.") at 5/24/2022 at 1:26:00-15.[5] Perhaps because of this admission, in its judgment, the trial court notes Williams' testimony and the Cabinet's arguments relating to the report but does not make findings as to whether KRS 61.878(1)(i) applies to the report. The record does not show that Williams ever requested such findings. It is incumbent on a party to move for specific findings where a trial court's findings are incomplete. CR 52.04. Without such a request, Williams' argument is deemed

---

[5] The Cabinet's counsel questioned Williams about his answer to the Cabinet's interrogatory which asked, "For each open records request identified in your answer Interrogatory No. 8 (above) please identify what documents you or your attorney received and how you believe the response to be deficient." R. at Envelope XVII, Plaintiff's Exhibit 39.1. Williams lists thirty alleged deficiencies in his answer. He does not allege the Cabinet improperly withheld the ombudsman's report as preliminary under KRS 61.878(1)(i).

waived, precluding our review. *Polley v. Allen*, 132 S.W.3d 223, 230 (Ky. App. 2004) (citation omitted).

Next, Williams claims the Cabinet withheld emails from Kelly Pompilio, VonHandorf, and Cooper. He alleges he received only a single email in response to this request. Without citing to the record or any supportive authority, Williams argues that more emails exist and should have been provided to him. Williams cites to the trial court's findings which state, "Pompilio, Sansbury, and Williams testified that there would have been multiple emails a day between them and Cooper in early 2015 and then the same would be true when VonHandorf began assigning cases after Sansbury left." R. at 1566-67.[6] The court then determined it "cannot find [the Cabinet] willfully withheld any of the requested documents. The [c]ourt finds Wolsing conducted a reasonable search for all documents requested by asking people directly to provide documents, as well as obtaining help from the Commonwealth Office of Technology to search for emails." *Id.* at 1570-71.

> Regardless of conflicting evidence, the weight of the
> evidence, or the fact that the reviewing court would have
> reached a contrary finding, due regard shall be given to
> the opportunity of the trial court to judge the credibility
> of the witnesses because judging the credibility of

---

[6] The Cabinet counters this argument by citing to exhibits containing many more emails the Cabinet provided in response to Williams' requests. Our review indicates the Cabinet provided Williams with more than one of Karey Cooper's emails. R. at Envelope XVI, Defendant's Exhibit 10.

witnesses and weighing evidence are tasks within the exclusive province of the trial court.

*Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (internal quotation marks and footnotes omitted). The trial court acted within its exclusive authority in finding Wolsing's testimony credible and relying on it. This is not clearly erroneous.

Finally, Williams argues it is "facially implausible" that Sansbury's emails were destroyed 28 days after she left the Cabinet. He cites to no evidence in the record supporting this allegation but generally urges us to consider "the record, taken in its totality[.]" Appellant's Brief at 25. We will not grant relief based upon a party's unsupported, conclusory statements. *See Jones v. Livesay*, 551 S.W.3d 47, 52 (Ky. App. 2018).

Based on the foregoing, the trial court's judgment under KRS 61.882(5) is not clearly erroneous.

<u>APPEAL NO. 2022-CA-1360-MR</u>

The Cabinet appeals from the jury verdict finding it violated provisions of the KWA and awarding Williams $2,000,000 in punitive damages. On appeal, the Cabinet argues: (1) Williams failed to prove any personnel action on the part of the Cabinet because he did not experience a materially adverse change to the terms and conditions of his employment; (2) Williams should have been barred from presenting evidence of personnel actions which occurred before May 6, 2015 under KRS 61.103(2); (3) the jury instructions were erroneous

-14-

because they did not include "personnel action"; (4) Williams failed to preserve his request for punitive damages; (5) the $2,000,000 punitive damages award was grossly excessive; (6) punitive damages exceeded what is permissible by statute; (7) the Cabinet was entitled to a mistrial because of statements made by Williams' counsel during opening and closing statements; and (8) at trial, the Cabinet met its burden under KRS 61.103(3).

> To prevail under the KWA, an employee must prove:
>
> (1) the employer is an officer of the state; (2) the employee is employed by the state; (3) the employee made or attempted to make a good faith report or disclosure of a suspected violation of state or local law to an appropriate body or authority; and (4) the employer took action or threatened to take action to discourage the employee from making such a disclosure or to punish the employee for making such a disclosure.

*Davidson v. Commonwealth, Dep't of Military Affairs*, 152 S.W.3d 247, 251 (Ky. App. 2004) (footnotes omitted). On appeal, the Cabinet does not contest Williams' proof of the first three elements.

In contesting the fourth *Davidson* element, the Cabinet argues it was entitled to summary judgment because Williams could not, as a matter of law, prove the Cabinet took any "materially adverse" personnel action against him to discourage or punish him for his disclosure. We review the trial court's denial of summary judgment without deference to its assessment of the record or conclusions "[b]ecause summary judgment does not require findings of fact but

-15-

only an examination of the record to determine whether material issues of fact exist[.]" *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010) (citation omitted).

> The KWA requires an employee to
>
>> show by a preponderance of evidence that the disclosure was a contributing factor in the **personnel action**. Once a prima facie case of reprisal has been established a disclosure determined to be a contributing factor to the **personnel action**, the burden of proof shall be on the agency to prove by clear and convincing evidence that the disclosure was not a material fact in the personnel action.

KRS 61.103(3) (emphasis added). To evaluate the Cabinet's argument, we must first define "personnel action" and then decide whether such an action must be materially adverse to the terms and conditions of the employee's employment under the KWA. Statutory construction is an issue of law which we review *de novo*. *Jefferson County Bd. of Educ. v. Fell*, 391 S.W.3d 713, 718 (Ky. 2012) (citation omitted).

The primary goal of statutory construction is to give effect to the intent of the legislature. *Bell v. Bell*, 423 S.W.3d 219, 223 (Ky. 2014) (footnote omitted). We cannot consider a singular provision but must construe the statute in its entirety. *Samons v. Kentucky Farm Bureau Mut. Ins. Co.*, 399 S.W.3d 425, 429 (Ky. 2013) (footnote omitted). We begin with the text of the statute itself and give terms their plain meaning. *Kentucky Heritage Land Conservation Fund Board v.*

-16-

*Louisville Gas and Electric Company*, 648 S.W.3d 76, 85 (Ky. App. 2022)

(citations omitted). Where a term is undefined by statute, "the plain meaning is

determined by reference to the common usage of the language used by the

[l]egislature." *Id*. (citation omitted).

In *Commonwealth Department of Agriculture v. Vinson*, 30 S.W.3d

162, 165 (Ky. 2000), the Supreme Court of Kentucky acknowledged that

"personnel action" is not defined in the KWA. Without providing a definition, the

Court held KRS 61.102(1) "recognizes the overt retaliatory act of reprisal as well

as the subtle exercise of official authority or influence in the relationship between

state employee and state government." *Id.* at 164. The Court also acknowledged

that the definition of "personnel action" is limited by the exclusions contained in

KRS 61.102(3). *Id*. at 165. Since *Vinson*, "personnel action" has otherwise

remained undefined.

In defining "personnel action," we will first consider the KWA as a

whole. *Samons*, 399 S.W.3d at 429 (footnote omitted). It mandates,

> [n]o employer shall subject to reprisal, or directly or
> indirectly use, or threaten to use, any official authority or
> influence, **in any manner whatsoever**, which tends to
> discourage, restrain, depress, dissuade, deter, prevent,
> interfere with, coerce, or discriminate against any
> employee who in good faith reports, discloses, divulges,
> or otherwise brings to the attention of . . . [the]
> appropriate body or authority, any facts or information
> relative to an actual or suspected violation of any law,
> statute, executive order, administrative regulation,

> mandate, rule, or ordinance . . . , or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety.

KRS 61.102(1) (emphasis added). Without directly referencing "personnel action," this provision makes clear the legislature's intention to broadly prohibit actions which might discourage an employee from making a good faith report or interfere with such a report. With this in mind, we now turn to the plain meaning of "personnel action."

To discern the plain meaning of "personnel action" we will consider the common definition of each of the two words. "Personnel" is defined as "a body of persons usually employed (as in a factory or organization)." *Personnel*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/ personnel (last accessed Dec. 4, 2023). "Action" is defined as "the process of doing something, conduct or behavior." *Action*, BLACK'S LAW DICTIONARY (11th ed. 2019). Taken together, "personnel action" can be defined as any conduct or behavior relating to persons working for an organization.

Therefore, considering both KRS 61.102(1) and the plain meaning of the language employed by the legislature, we construe "personnel action" to mean any act relating to a state employee which tends to discourage, restrain, depress, dissuade, deter, prevent, interfere with, coerce, or discriminate against an employee who has made a good faith report under the KWA. Some actions, such as

-18-

termination or demotion, are clearly encompassed by this definition. *See Consolidated Infrastructure Management Authority, Inc. v. Allen*, 269 S.W.3d 852, 854 (Ky. 2008) (employee was terminated); *see also Harper v. University of Louisville*, 559 S.W.3d 796, 804 (Ky. 2018) (employee's position was eliminated); *see also Cabinet for Health and Families and Children v. Cummings*, 163 S.W.3d 425, 430 (Ky. 2005) (employee was removed from his position on a research study); *see also Vinson*, 30 S.W.3d at 163 (employees were demoted). However, as the record in this case demonstrates, some actions may not fit as clearly within this definition.

To better understand what may qualify as a "personnel action," we look to persuasive federal authority. The KWA and the federal Whistleblower Protection Act ("WPA") mirror one another, and Kentucky appellate courts have previously looked to the WPA and the federal courts' interpretations thereof as persuasive authority. *See Harper*, 559 S.W.3d at 802; *see also Vinson*, 30 S.W.3d at 169. The purpose of both the KWA and WPA is to protect employees from retaliation for disclosure of evidence of wrongdoing by their employers. *See Davidson*, 152 S.W.3d at 255 (footnote omitted). Similar to the KWA, the WPA prohibits

> [a]ny employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority –

. . .

(8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of –

(A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences –

(i) any violation of any law, rule, or regulation[.]

5 U.S.C.[7] § 2302(b).  Pertinent to this matter, the WPA also specifically defines

"personnel action" as

(i)   an appointment;

(ii)   a promotion;

(iii)   an action under chapter 75[8] of this title or other disciplinary or corrective action;

(iv)   a detail, transfer, or reassignment;

(v)   a reinstatement;

(vi)   a restoration;

(vii)   a reemployment;

(viii)   a performance evaluation under chapter 43 of this title or under title 38;

---

[7] United States Code.

[8] Chapter 75 governs certain removals, suspensions, reductions in grade, reductions in pay, and furloughs.  5 U.S.C. § 7512.

(ix)    a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph;

(x)    a decision to order psychiatric testing or examination;

(xi)    the implementation or enforcement of any nondisclosure policy, form, or agreement; and

(xii)    any other significant change in duties, responsibilities, or working conditions;

with respect to an employee in, or applicant for, a covered position in an agency[.]

5 U.S.C. § 2302(a)(2)(A).  Just as we have broadly construed the meaning of "personnel action" under KWA, federal courts have described this definition as "necessarily[] broad." *Mangano v. United States*, 529 F.3d 1243, 1247 (9th Cir. 2008) (citation omitted).  Although the federal definition is not binding on our interpretation of the KWA, it is illustrative of the actions it may prohibit.[9]

A plaintiff must also prove any alleged personnel action amounted to "materially adverse" changes to the terms and conditions of his employment.

---

[9] Williams urges us to rely on the definition of "penalization" contained in KRS 18A.005 as a definition for "personnel action."  At trial, Williams also heavily relied on this definition in arguing he was retaliated against by the Cabinet.  The KWA does not use "penalization" or referred to KRS 18A.005.  *See* KRS 61.101-61.103.  Since the trial, the legislature amended KRS 18A.005 to remove penalization as a defined term.  We decline to rely on a since-removed definition for an inapplicable term in defining "personnel action."

Although this is not explicitly required under the statute, Kentucky courts have established this requirement in the context of retaliation under the Kentucky Civil Rights Act ("KCRA").[10] The KCRA and KWA have similar purposes regarding retaliation. Under the KCRA, it is unlawful for any person "[t]o retaliate or discriminate **in any manner** against a person because he has opposed a practice declared unlawful by this chapter . . . or participated in any manner in any investigation, proceeding, or hearing under this chapter[.]" KRS 344.280(1) (emphasis added). Just as the KWA broadly prohibits any action which tends to discourage an employee from making a good faith disclosure, the KCRA prohibits retaliation "in any manner."

Despite the legislature's expansive prohibition on retaliation, the Supreme Court of Kentucky has construed the KCRA to require that a plaintiff establish "a materially adverse change in the terms and conditions of his employment" to prove retaliation. *Brooks v. Lexington-Fayette Urban County Housing Authority*, 132 S.W.3d 790, 802 (Ky. 2004). A "materially adverse" change is defined as

> more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of

---

[10] This Court has cited to the KCRA in holding a personnel action must be materially adverse under the KWA in two unpublished decisions. *See Jones v. Oldham County Sheriff's Dep't*, No. 2009-CA-000350-MR, 2010 WL 1508150, *10-11 (Ky. App. Apr. 16, 2010); *see also Arnold v. Holmes*, No. 2009-CA-000514-MR, 2010 WL 3810191, *2-3 (Ky. App. Oct. 1, 2010).

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Id*. at 802 (citation omitted). In *Burlington Northern and Santa Fe Railway Company v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006) (citation omitted), the Supreme Court of the United States held that an action is materially adverse if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." The Court emphasized the importance of differentiating between significant and trivial harms. *Id*. Recognizing that some acts may be "immaterial in some situations [and] material in others[,]" the Court held the significance of an act depends on context, making whether an alleged personnel action is materially adverse a question of fact for the jury to decide. *Id.* at 68, 70, 126 S. Ct. at 2415, 2416.

The Cabinet argues it was entitled to summary judgment as a matter of law because none of the personnel actions alleged by Williams were materially adverse to the terms and conditions of his employment. In denying the Cabinet's motion, the trial court held there were genuine issues of material fact as to the following alleged personnel actions: (1) the Cabinet's attempt to force Williams to permanently transfer to Boone County without his consent and without following proper procedures; (2) supervisors entering Williams' office without his

-23-

knowledge to find case files; (3) removal of Williams' duty to assign work to two social workers from Scott County; (4) asking him to produce timesheets and other documents relating to social workers he supervised in Gallatin County; (5) removal of the investigation log from Williams' duties; (6) mandating overtime for the staff in Boone County when there was no such mandate for other offices in the region; (7) assigning Williams a team of less experienced staff than he had in Gallatin County; (8) changing the code to the Boone County office door without informing him; (9) requiring him to begin his day at his workstation; and (10) although they expressed concerns about his mental health, Williams' supervisors did not refer him to the employee assistance program. R. at 1307-10. In addition to claiming none of these actions were materially adverse, the Cabinet offered non-retaliatory explanations for each alleged personnel action.

While we question whether some of these actions would be sufficient on their own to survive summary judgment, we may not judge each alleged action in isolation.[11] Instead, we must consider all the circumstances surrounding the alleged conduct. *White*, 548 U.S. at 71, 126 S. Ct. at 2417. At a minimum, Williams' allegations of reassignment of duties, removal of supervisory responsibilities, the change of the office door code, and mandatory overtime are

---

[11] For example, had Williams alleged the only personnel action was the threat of a temporary transfer, it would be difficult to prove a materially adverse change where no change occurred.

-24-

personnel actions under the plain meaning of KRS 61.103(3). Considering all the actions in their full context and viewing the evidence in the light most favorable to Williams, there were genuine issues of material fact as to whether the alleged personnel actions amounted to materially adverse changes to the terms and conditions of his employment. The trial court did not err in denying the Cabinet's motion for summary judgment.[12]

Second, the Cabinet claims Williams was statutorily barred from presenting evidence of alleged personnel actions by the Cabinet which occurred before May 6, 2015. An employee alleging a violation of the KWA "may bring a civil action for appropriate injunctive relief or punitive damages, or both, within ninety (90) days after the occurrence of the alleged violation." KRS 61.103(2). The Supreme Court of Kentucky reasoned that "[i]n light of the significant policy concerns surrounding such awards, the General Assembly's decision to limit the right to collect punitive damages from public entities is rational and harmonizes with the overall intent of the [KWA]." *Allen*, 269 S.W.3d at 856.

Williams filed his complaint on August 4, 2015. Under the plain meaning of the statute, his cause of action must be limited to personnel actions which occurred no earlier than May 6, 2015. Williams introduced a May 4, 2015

---

[12] Although the Cabinet raised this issue again in its motion for directed verdict and motion for JNOV, it does not appeal the trial court's denial of those motions. Therefore, we will not consider whether a directed verdict or JNOV would have been warranted.

email from Prewitt informing him that he would be permanently transferred to Boone County. Staff, including Williams, received an email on May 5, 2015, informing them of Brun's promotion to SRAA, making her Williams' supervisor. Williams argues the evidence he presented regarding these actions was admissible even if he was not entitled to recover damages because they occurred outside the time allowed by KRS 61.103(2). This is unsupported by law. Williams specifically alleges both the threat of a permanent transfer and Brun's promotion were personnel actions taken against him under KRS 61.103(3). The trial court's decision to allow this evidence into the record was in error. On remand, Williams is prohibited from presenting evidence of these or any other alleged personnel actions which occurred outside the time allowed by KRS 61.103(2).

Third, the Cabinet claims the jury instructions improperly failed to include the term "personnel action."[13] The Cabinet proposed an instruction which asked the jury to "[s]tate whether you are satisfied from the evidence as follows (if you are not so satisfied, answer NO): . . . That Mr. Williams being _____ was a **personnel action** that was a material change in the terms and conditions of his employment." R. at 1507 (emphasis added). The instruction asked the jurors to fill in the blank with the specific action which they found did or did not constitute

---

[13] The Cabinet also alleges the jury instructions should have included a list of alleged personnel actions. However, such a list was not included in its proposed instructions, and it did not raise this argument in its motion for JNOV. Therefore, we will not address it herein.

a personnel action. The Cabinet's proposed instructions consistently use "personnel action." *Id.* at 1507-09. In the final instructions, Instruction No. 2 states

> In order for [Williams] to prevail on his claim of retaliation, he must establish the following:
>
> . . .
>
> (3) [Williams] must demonstrate by a preponderance of the evidence that his reports or disclosures were a contributing factor in the **retaliation and penalization** taken against him. . . .
>
> (4) If [Williams] sufficiently demonstrates that his disclosures were a contributing factor for the acts of [the Cabinet], [the Cabinet] can avoid liability only if it shows by clear and convincing evidence that [Williams'] reports, or disclosures were not a material factor in the acts of **retaliation or penalization**.

R. at 1618 (emphasis added). The final instructions do not include the term "personnel action." We review alleged errors regarding jury instructions *de novo*. *Carmical v. Bullock*, 251 S.W.3d 324, 328 (Ky. App. 2007).

While a trial court has some discretion as to what instructions are supported by the evidence, it has none "to give an instruction that misrepresents the applicable law." *Sargent v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015), *overruled on other grounds by University Medical Center, Inc. v. Shwab*, 628 S.W.3d 112 (Ky. 2021). Here, the trial court failed to instruct the jury to find Williams proved a "personnel action" and instead instructed on the terms

-27-

"retaliation" and "penalization" which do not appear in the KWA. Throughout the trial, Williams argued he was penalized by the Cabinet under KRS 18A.005. As previously addressed, reliance on this definition was erroneous. KRS 61.103(3) clearly sets out the parties' burdens of proof using the term "personnel action." The repeated use of the irrelevant term "penalization" at trial and again in the jury instructions along with "retaliation" where the statute unambiguously uses "personnel action" is an error demanding reversal.

Next, the Cabinet raises several arguments relating to punitive damages, including (1) Williams did not preserve punitive damages; (2) the punitive damages award is grossly excessive; and (3) the punitive damages award exceeds the scope allowed by statute.

First, the Cabinet claims Williams both failed to properly amend his answer to its interrogatory regarding punitive damages and did not comply with the trial court's order requiring him to file an itemization of monetary damages sixty days before trial. "When a claim is made against a party for unliquidated damages, that party may obtain information as to the amount claimed by interrogatories. If this is done, the amount claimed shall not exceed the last amount stated in interrogatories[.]" CR 8.01(2). This rule, read together with CR 26.05, can be construed to impose a "'seasonable' time limit on a party's ability to supplement an answer to interrogatories for claims for unliquidated damages." *Fratzke v.*

*Murphy*, 12 S.W.3d 269, 272 (Ky. 1999). The purpose of CR 8.01(2) is to put the defendant on notice of the amount of unliquidated damages sought by the plaintiff. *Thompson v. Sherwin Williams Co., Inc.*, 113 S.W.3d 140, 143 (Ky. 2003).

In his answer to the Cabinet's interrogatory, Williams stated he was seeking in excess of one hundred million dollars in compensatory and punitive damages. R. at 1606. While the Cabinet is correct that the trial court subsequently dismissed Williams' claims for emotional distress and humiliation, his failure to supplement his answer thereafter does not bar his claim for punitive damages. The Cabinet had notice of the damages at stake and was able to "advise the trier of fact as to what amounts are fair and reasonable as shown by the evidence." CR 8.01(2).

Furthermore, a trial court has the "inherent authority to enforce its own orders." *Boland-Maloney Lumber Co., Inc. v. Burnett*, 302 S.W.3d 680, 688 (Ky. App. 2009) (citation omitted). We must defer to the trial court's interpretation of its own order. *See VP Louisville, LLC v. NBH Bank, N.A.*, 578 S.W.3d 753, 757 (Ky. App. 2019) (citation omitted). While Williams did not file an itemization of damages, the Cabinet was on notice regarding punitive damages. For this reason, the trial court's interpretation and enforcement of its trial order was not manifestly unreasonable. *Id.*

Next, the Cabinet claims the jury's punitive damages award is grossly excessive. Under the KWA, an employee may bring an action for "appropriate injunctive relief or punitive damages, or both[.]" KRS 61.103(2). In such an action, a court may order "reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, exemplary or punitive damages, or any combination thereof." KRS 61.990(4). Punitive damages may be appropriately awarded even when compensatory damages have not been proven. *Vinson*, 30 S.W.3d at 166 (citations omitted). An award of punitive damages in the absence of compensatory damages is not a *per se* violation of due process. We review the constitutionality of punitive damages *de novo*. *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 298 (Ky. App. 2009) (citation omitted).

A punitive damages award violates the due process clause of the Fourteenth Amendment when it is "grossly excessive." *Id*. (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589, 1595, 134 L. Ed. 2d 809 (1996)). The Supreme Court of the United States has given us the following "guideposts" to help us to determine what "grossly excessive" means in any given case:

> (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive

-30-

> damages awarded by the jury and the civil penalties
> authorized or imposed in comparable cases.

*Ragland v. DiGiuro*, 352 S.W.3d 908, 917 (Ky. App. 2010) (citing *State Farm*

*Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S. Ct. 1513, 1520, 155 L.

Ed. 2d 585 (2003) (citation omitted)). The Supreme Court has further identified

the following factors for evaluating the reprehensibility of the defendant's conduct:

> the harm caused was physical as opposed to economic;
> the tortious conduct evinced an indifference to or a
> reckless disregard of the health or safety of others; the
> target of the conduct had financial vulnerability; the
> conduct involved repeated actions or was an isolated
> incident; and the harm was the result of intentional
> malice, trickery, or deceit, or mere accident.

*Id.* (quoting *Campbell*, 538 U.S. at 419, 123 S. Ct. at 1521) (citation omitted)).

Herein, we cannot describe the Cabinet's conduct as having a high

degree of reprehensibility. Williams experienced no physical harm, nor did he

experience economic harm. The Cabinet did not act in a way that reflected

indifference or reckless disregard for the health or safety of Williams or any other

employee. Williams did not allege nor show he had any particular financial

vulnerability where he was not threatened with, nor did he experience economic

harm. The Cabinet's actions may be described as repeated but there is no evidence

they were the result of intentional malice, trickery, or deceit. The weight of these

factors is against finding the Cabinet's behavior reprehensible.

Additionally, there is a significant disparity between the actual harm Williams suffered and the jury's $2,000,000 punitive damages award. Often courts employ a ratio of punitive to compensatory damages in assessing this factor. *See Campbell*, 538 U.S. at 425, 123 S. Ct. at 1524 ("Our jurisprudence and the principles it has now established demonstrate . . . few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."). While we cannot reduce our decision on this factor to a simple mathematical equation, we must recognize the significance of the fact that Williams suffered no actual harm. *See Ragland*, 352 S.W.3d at 921 (citing *Gore*, 517 U.S. at 582, 116 S. Ct. at 1602). Where a "particularly egregious act" results in only a small amount of economic harm, a proportionately higher award of punitive damages may be appropriate. *Id.* However, Williams did not prove a particularly egregious act, as demonstrated by our analysis of the low degree of reprehensibility. He was not terminated nor demoted. His salary was not reduced, and he lost no benefits. At most, he proved only minor to moderate changes to his work environment and assigned duties. Therefore, the vast disparity between the award and the harm Williams suffered is without justification.

Finally, there is a substantial difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. "Because they are paid with taxpayer dollars, it is common that punitive

-32-

damage awards are either unavailable or heavily restricted when sought against a public entity." *Allen*, 269 S.W.3d at 856 (citation omitted). Unlike many statutes, including the KCRA, the KWA expressly allows recovery of punitive damages. KRS 61.103(2). However, the restrictions on recovery of punitive damages from government agencies, as well as the infrequency of punitive damage awards under the KWA leave us with only one case for comparison. Therein, two employees were awarded one million dollars in punitive damages because they were demoted in violation of the KWA after making a good faith report. *Vinson*, 30 S.W.3d at 163. However, the constitutionality of the punitive damages award was not at issue in *Vinson*. Otherwise, "[a]ny person who willfully violates the provisions of KRS 61.102(1) shall be guilty of a Class A misdemeanor." KRS 61.990(3). The maximum fine for a Class A misdemeanor is $500. KRS 534.040(2)(a).

Based on the standard established in *Campbell*, 538 U.S. at 418, 123 S. Ct. at 1520, the $2,000,000 punitive damages award is grossly excessive and must be reversed.

We cannot know the jurors' thoughts when they awarded Williams' punitive damages, but they may have been reacting to the allegations which formed the basis of Williams' report. We agree that failure to investigate or follow up on numerous claims of neglect and abuse is an inexcusable violation of the Cabinet's mandate to protect children. However, no matter how egregious the Cabinet's

conduct may have been, those actions are not the subject of this case. The purpose of the KWA is to protect employees from reprisal when they make good faith reports of wrongdoing. *See Davidson*, 152 S.W.3d at 255 (footnote omitted). It is not the responsibility of juries in these proceedings to adjudicate the merits of allegations in the underlying reports. Williams may only recover damages for the harm he experienced not for the perceived harm experienced by the children and families he alleged the Cabinet failed to serve.

We need not address the Cabinet's argument that the punitive damages award is arbitrary and exceeds what is allowable by the KWA because our determination that the award was grossly excessive mandates reversal. Because reversal could result in a retrial and the Cabinet's remaining allegations of error may be repeated, we address those allegations.

The Cabinet contends the trial court erred by denying its two motions for mistrial based on Williams' counsel's inflammatory statements made during opening and closing statements. We review a denial of a motion for mistrial for abuse of discretion. *Knuckles v. Commonwealth*, 315 S.W.3d 319, 322 (Ky. 2010). "A mistrial is appropriate only where the record reveals a manifest necessity for such an action or an urgent or real necessity." *Id*. (footnote omitted). The determination of whether a manifest necessity exists is within the "sound discretion

of the trial court." *Sneed v. Burress*, 500 S.W.3d 791, 793 (Ky. 2016) (citation omitted).

Herein, Williams' counsel began her opening statement by telling the jury

> this case started with 93 incidents of child abuse and neglect that were sent to CPS in Boone County and not acted on for as much as 18 months. These incidents included sexual abuse of a child, babies being born drug addicted and suffering from withdrawal, hungry children being locked out of their home in the cold with no food, and children exposed to domestic violence.

V.R. 7/5/2022 at 1:11:12-33. The trial court overruled the Cabinet's objection to counsel discussing the details of the underlying Cabinet investigations. At the end of her statement, counsel said ". . . when a government agency does something wrong, like leave children in dangerous situations and go after the person who brings this to light, that wrong got reported. The agency should have consequences. . . . We need you to send a message." *Id.* 7/5/2022 at 1:36:00-13. The Cabinet objected and moved for a mistrial for counsel's "send a message" statement. The trial court sustained the objection but denied the motion for mistrial. The Cabinet did not request the trial court admonish the jury to disregard counsel's statement and the trial court did not do so of its own accord.

In her closing argument, Williams' counsel told the jury, "You have more power today than you might ever have in your life to make sure that there's

not going to be another child or another giant, big problem at the Cabinet." *Id.* 7/8/2022 at 12:25:00-14. The trial court overruled the Cabinet's objection to this statement. She then told the jury they had to be "the voice of the community" and "send a message" to the Cabinet. *Id.* 7/8/2022 at 12:33:05, 12:33:20. The trial court again sustained the Cabinet's objection to the "send a message" statement and admonished the jury not to consider it. The trial court denied the Cabinet's second motion for mistrial.

As a general rule, counsel is given "wide latitude" in both opening and closing statements. *Pauly v. Chang*, 498 S.W.3d 394, 412 (Ky. App. 2015) (citation omitted). However, counsel "may not encourage the jury to return a verdict based on passion or prejudice, or for reasons not reasonably inferred from the evidence." *Bush v. Commonwealth*, 839 S.W.2d 550, 557 (Ky. 1992) (citation omitted). The Cabinet asks us to apply the criminal law prohibition on "send a message" statements to this matter. In criminal law, the appellate courts have "repeatedly indicated that 'send a message' statements are improper in the Commonwealth and prosecutors should not engage in such argument[.]" *Hall v. Commonwealth*, 551 S.W.3d 7, 19 (Ky. 2018) (footnote omitted). While prosecutors may not use these statements to put the pressure of the community on the jury, they may ask the jury to send a message to deter the defendant from future misconduct. *Cantrell v. Commonwealth*, 288 S.W.3d 291, 299 (Ky. 2009).

Herein, we agree with the Cabinet that Williams' counsel conflated the Cabinet's actions which formed the basis of Williams' report with its actions toward him. However, the Cabinet moved for a mistrial solely on the grounds of counsel's "send a message" statements. Counsel asked the jury to send a message to this defendant, the Cabinet, to deter it from future misconduct. This does not amount to a prohibited statement under *Cantrell*, 288 S.W.3d at 299. Despite this, the trial court sustained the Cabinet's objections and admonished the jury to disregard counsel's statement during her closing argument. "A jury is presumed to follow an admonition." *Jefferson v. Eggemeyer*, 516 S.W.3d 325, 338 (Ky. 2017) (citations omitted). Under these circumstances, there was no manifest necessity for a mistrial and the trial court did not abuse its discretion in denying the motion.

Finally, the Cabinet argues that, even if Williams met his burden under KRS 61.103(3), it proved by clear and convincing evidence that Williams' letter to the OIG was not a material fact in the personnel actions. The Cabinet cites to evidence it claims prove non-retaliatory reasons for the personnel actions taken against Williams. In his brief, Williams cites to contradictory evidence.[14]

---

[14] Williams is correct that the Cabinet fails to state whether this issue is properly preserved for our review and, if so, in what manner. RAP 32(A)(4). Although it is not our responsibility to do so, we reviewed the record and found the Cabinet preserved this issue in its motion for JNOV. *See Gasaway v. Commonwealth*, 671 S.W.3d 298, 311 (Ky. 2023).

The standard for granting a motion for JNOV is a challenging one for an appellant to meet. *Estate of Moloney v. Becker*, 398 S.W.3d 459, 461 (Ky. App. 2013) (citation omitted). We can reverse the trial court's denial only if the Cabinet has proven "the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice." *Id.* (citation omitted). Viewing the totality of the evidence in the light most favorable to Williams and drawing "every fair and reasonable inference" therefrom in his favor, we cannot find there was "a complete absence of proof" on the issue of whether the Cabinet met its burden under KRS 61.103(3). *Id.* (citation omitted). Because reasonable people could disagree on this issue, the trial court's denial of the motion for JNOV was not clearly erroneous. *Id.* (citation omitted).

## CONCLUSION

Based on the foregoing, we affirm the June 30, 2022 judgment of the Boone Circuit Court denying Williams' KORA claims in appeal No. 2022-CA-0935-MR. In appeal No. 2022-CA-1360-MR, we affirm the trial court's February 18, 2022 and October 25, 2022 orders. However, we reverse the trial court's July 25, 2022 judgment on the grounds that the jury instructions were improper, Williams was permitted to present evidence outside the 90-day limitation in KRS 61.103(2), and the punitive damages award was grossly excessive. We remand this matter for a new trial on Williams' KWA claims consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR TIMOTHY
WILLIAMS:

Kelly A. Wiley
Covington, Kentucky

Jeffrey A. Lawson
Covington, Kentucky

BRIEFS FOR CABINET FOR
HEALTH AND FAMILY
SERVICES:

Blake A. Vogt
Lucas Roberts
David T. Lovely
Frankfort, Kentucky